ESTATE OF NATHANIEL COLE, Deceased, MARIA COLE DEVORE, Executrix, et al. [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent. Estate of Cole v. Commissioner
Docket Nos. 1745-71, 1759-71, 1760-71.
United States Tax Court
T.C. Memo 1973-74; 1973 Tax Ct. Memo LEXIS 213; 32 T.C.M. (CCH) 313; T.C.M. (RIA) 73074; March 29, 1973, Filed *213 Harry Margolis for the petitioners. Sheldon M. Sisson and Richard H. Gannon, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1960 through 1964 as follows:
Docket
Petitioner
Year
Deficiency
1745-71
Estate of Nathaniel Cole, Deceased, Maria Cole Devore, Executrix
1961
$145,803.76
1962
65,806.37
1963
188,479.78
1964
493,953350
1759-71
Estate of Nathaniel Cole, Deceased, Maria Cole Devore, Executrix, and Maria Cole Devore, Surviving Spouse
1960
67,419.39
1760-71
Maria Cole Devore
1961
145,803.76
1962
65,806.37
1963
188,479.77
1964
493,953.49
Some of the issues raised by the pleadings have been disposed of by the parties, leaving for our decision the following: (1) Whether amounts paid by Capitol Records, Inc., to Associated Arts, N.V. (AA), a Netherlands Antilles corporation, in excess of the amounts paid by AA to Nathaniel Cole (Cole) in the years 1961 through 1964, constitute income of Cole which he attempted to assign to AA, and in the alternative, whether these amounts are properly allocable under section 482, I.R.C. 1954, [2] *214 to Cole in order to prevent evasion of tax or to clearly reflect Cole's income. [3]
(2) Whether the total income earned and expenses incurred by a Panamanian Corporation, Presentaciones Musicales S.A. (PMSA) in the years 1961 through 1964 from foreign personal appearance tours made by Cole under the auspices of PMSA and tape recordings of such appearances constitute a portion of Cole's income and expenses because of PMSA's being a mere sham, and in the alternative, whether the total income earned and expenses incurred by PMSA from Cole's foreign personal appearance tours and tape recordings of such tours are properly allocable to Cole under section 482 in order to prevent evasion of tax or to clearly reflect Cole's income. (3) Whether the distribution to the Coles in 1961 of the proceeds from the sale of property by their wholly owned subchapter "S" corporation (Channel Land Company) reduces the basis of their stock to *215 the extent that the distribution exceeds the corporation's current and accumulated earnings and profits. (4) Whether the legal fees and accounting costs incurred by Channel Land Company in 1961 were ordinary and necessary business expenses of the corporation or were a cost of the Coles' acquisition of Channel's stock or of Channel's selling its corporate property. (5) Whether Cole's basis in K.C. Records, Inc., a wholly owned subchapter "S" corporation properly includes certain loans in the amount of $26,500 by third parties to the corporation which were guaranteed by Cole, thereby entitling Cole to deduct net operating 4 losses of the corporation in this additional amount in 1964 or in the alternative is the loss of K.C. Records, Inc., an ordinary business loss of Cole.
(6) Whether Cole suffered a deductible loss in 1963 of the $35,000 he contributed of $130,000 used by a partnership in which Cole was a partner to purchase rights to a television series, "Emilio," which rights became worthless in 1963. (7) Whether Kell Cole Productions, a subchapter "S" corporation wholly owned by the Coles is entitled to deduct as a production expense in 1963 the amount of $91,000 paid to Great *216 Western Entertainers (GWE), a corporation which was a member of the partnership which purchased rights to "Emilio" but otherwise unrelated to Cole, under a contract whereby GWE assigned 75 percent of the rights in the television series, "Emilio," to Kell Cole and guaranteed to Kell Cole a profit of $5,000 a week for 30 weeks on Kell Cole's show, "Sights and Sounds," in return for all profits of Kell Cole on "Sights and Sounds" in excess of $150,000. (8) Whether Cole or Kell Cole Productions, his wholly owned subchapter "S" corporation, may deduct as a commission paid or as an ordinary and necessary business expense in 1961, 1962, or 1963, an amount of $60,000 paid to General Artists Corporation (GAC) because of Cole's guarantee of an advance in that amount by GAC to Kell Cole Productions for the production by Kell Cole of "I'm With You."
All of the facts have been stipulated. We find the facts together with the exhibits as stipulated, and these facts are a part of this opinion to the same extent as if recited herein. We will set forth herein in summary form only those facts which are necessary for an understanding of this opinion. [4] *217 Maria Cole Devore is the widow of Nathaniel Cole and the executrix of his estate. Maria and Nathaniel Cole filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue, Los Angeles, California. Nathaniel Cole filed Federal income tax returns for the taxable years 1961, 1962, 1963, and 1964 with the district director of internal revenue, Los Angeles, California, and Maria Cole filed separate Federal income tax returns for the taxable years 1961, 1962, 1963, and 1964 with the district director of internal revenue, Los Angeles, California. In their separate returns for the years 1961 through 1964 Nathaniel and Maria Cole each reported income and claimed deductions on the basis of community property. Maria Cole Devore resided in Los Angeles, California at the time of the filing of each of her petitions in this case and each of the petitions she filed as executrix of Nathaniel Cole's estate. Nathaniel Cole, popularly known as Nat "King" Cole, was one of the outstanding entertainers of this century. Although Nathaniel Cole *218 is now deceased, he will be referred to herein as petitioner since the issues herein deal primarily with his professional activities and Nathaniel and Maria Cole will be referred to as petitioners. Petitioner's rise to the top of the entertainment world began in 1942 when he signed a recording contract with the then newly established company, Capitol Records, Inc. Sources of his income other than recording royalties included receipts from songwriting and personal appearances. Issues (1) and (2) In late 1959, Norman Granz, a prominent jazz music promoter, proposed to petitioner's agent, Carlos Gastel, that petitioner make a tour through Western Europe in the spring of 1960 under Granz's auspices. Petitioner agreed to make the tour. A lawyer representing Granz informed petitioner's attorney that a Panamanian corporation was the preferred vehicle for promoting such a tour since it would not do business in the United States and would not be subject to United States taxation. Accordingly, a Panamanian corporation, Presentaciones Musicales S.A. (hereinafter referred to as PMSA) was incorporated on March 7, 1960. The original capitalization of PMSA was $10,000 of which $5,100 came *219 from a Panamanian corporation wholly owned by Granz, Record Manufacturing S.A., and $4,900 came from petitioners. The stock actually issued went 51 percent to Record Manufacturing S.A., 24.5 percent to Maria Cole, and 24.5 percent to Nathaniel Cole. On March 15, 1960, petitioner entered into an employment agreement with PMSA providing for payment by PMSA to petitioner at the rate of $8,500 per week for personal appearances outside the United States. The agreement provided for petitioner's services on a 3-week tour of Europe during April of 1960 with PMSA having an option to extend the tour for an additional 2 weeks. During April 1960 petitioner toured Western Europe for PMSA for 20 days and was paid at the rate of $8,500 per week by PMSA. Petitioner during this tour made an appearance in England which was taped jointly by PMSA and ATV, a British corporation which operates a commercial television network and engages in other entertainment activities. The tape was owned one-half by PMSA and one-half by ATV. PMSA employed Norman Granz as its representative to handle petitioner's European tour and paid him $2,000 per week for 3 weeks. PMSA also supplied and paid for the orchestra, *220 transportation, promotional salaries and expenses, and all other tiems required for the tour. The tour was not successful and PMSA had a net operating loss from the tour of $8,388.40. Petitioner employed the General Artists Corporation to serve as his booking agent for personal appearance tours in the United States. This corporation also served as agent for PMSA when petitioner appeared anywhere under his contract with PMSA. Early in 1961, petitioner toured the Orient for PMSA for approximately 3 weeks. Petitioner was paid $25,000 for that tour which was at the rate of $8,500 per week. Petitioner made one Canadian appearance for PMSA thereafter in 1961 and was paid at the rate of $8,500 per week for a total of $10,000. All payments were net to petitioner. On the tour of the Orient, PMSA employed a tour manager, Yempuku, who also acted as booking agent in the Orient. On behalf of PMSA, Yempuku paid transportation, housing, advertising and promotion, and all agents' fees in connection with the tour. From tours made by petitioner and tapes made by him, PMSA had total gross receipts of $90,735.41 in 1961 and expenses of $60,710.49. Of the profit of $30,024.92 the amount of $13,000 *221 came from PMSA's one-half interest in a television tape that petitioner had made in England in 1960. The total profit to PMSA from activities petitioner engaged in for it in 1961 was $17,024.92. The only activity of petitioner on behalf of PMSA in 1962 was a trip to Mexico.Petitioner was paid on this tour at the rate of $8,500 per week for a total of $12,000. PMSA paid $3,000 in Mexican taxes and a small amount of travel and incidental expenses of the trip. PMSA had a small operating loss from this tour in 1962. Petitioner went both to England and Australia for PMSA in 1963. The tours together took 4 weeks and petitioner was paid at the rate of $8,500 per week, receiving a total of $34,747.65. The gross receipts from the two tours to PMSA were $98,338.06. PMSA supplied transportation and housing, promotion, paid Australian income tax, and otherwise took all of the producer's risks. Yempuku once again acted for PMSA as promoter and booking agent and on both tours PMSA paid agent's fees in the United States. Expenses other than petitioner's salary came to just over $50,000 and PMSA showed a profit of slightly less than $14,000. PMSA received in 1963 an additional sum of $5,600 *222 from a tape that had been made by petitioner sometime previously. No payment was made to petitioner in connection with this tape since petitioner had been compensated at the time he appeared. PMSA did pay agent's fees and a small amount of transfer expenses totaling slightly more than $1,200 in connection with this tape. The profit from this tape was a little less than $4,200. There were no further performances by petitioner for PMSA prior to his death in February 1965. In 1964, PMSA received $4,200 from the rerun of the television tape which produced $5,600 in 1963. The net profit to PMSA from this tape in 1964 was slightly over $3,200. During the years 1960 through 1963 petitioner made personal appearances in the United States in a tour entitled, "Sights and Sounds" for weekly compensation of $6,000. On April 28, 1960, petitioner transferred his 24.5 percent ownership of PMSA to a trust he created for the benefit of his wife, Maria Cole. On the same day Maria Cole transferred her 24.5 percent ownership of PMSA to another trust created for the benefit of petitioner. The trustee of both trusts was the Arawak Trust Co., Ltd., a large Bahamian trust company. Petitioner, *223 in the trust he created for Maria Cole, reserved the right to change the trustee to another corporate trustee. In 1963 petitioner did change the trustee of the trust to the Aruba Bonaire Curacao Trust Co., Ltd. (ABC), another Bahamian trust company, the directors of which included two prominent Netherlands Antilles lawyers who had arranged a number of contracts between Netherlands Antilles corporations and American artists, writers, entertainers, and motion picture and television producers. The profitability of such contracts to Netherlands Antilles corporations resulted to a large extent from the fact that the tax treaty between the United States and the Netherlands was extended in 1955 to the Netherlands Antilles. Soon after the trusts of which the PMSA stock was the corpus were created, counsel for the trustee advised the trustee that petitioner should have no interest as beneficiary in a trust that could profit from the earnings of a corporation which employed petitioner. Thereupon, Arawak Trust Co., acting as trustee, sold for $5,000 the PMSA stock which belonged to the trust of which petitioner was a beneficiary to the trust which petitioner had created for the benefit *224 of his wife, Maria Cole. The $5,000 price which was paid in August of 1960 was based on a projection made by Norman Granz. PMSA was managed entirely by Granz during all of the period in which his solely owned corporation, Record Manufacturing S.A. held 51 percent ownership of PMSA, that is, from March 1960 until August 1961. During this period petitioner made the planned tour of western Europe and the tour of the Orient in early 1961. Conflicts among petitioner, Granz, and the Arawak Trust Co. over travel arrangements, disputed charges, and other like items led to a proposal by the Arawak Trust Co. to buy the shares of PMSA held by Record Manufacturing S.A., and a proposal by Granz to buy out the PMSA shares held by the Arawak Trust Co. as trustee. The conflicts were resolved when PMSA redeemed the stock held by Record Manufacturing S.A. in August 1961 for $5,100. Petitioners on their 1960 return and on their separate returns for 1961 through 1964 reported the $8,500 a week payments received by petitioner from PMSA but reported no other income from the tour and tapes made by petitioner under his contract with PMSA. Respondent in his notice of deficiency to each petitioner *225 increased that petitioner's reported income for the years 1961 through 1964 in connection with the tours and tapes in the following amounts with the explanation as quoted: It is determined that the items of gross income as identified in the following year by year tabulation were all earned by you in connection with your activities in the trade or business of being a professional entertainer. Since these items of gross income to the extent indicated below were not reported in your income tax returns for the years in which earned, your taxable income is increased accordingly. Activity
1961
Reported
Corrected
Increases
Japan tour
$25,000.00
$50,000.00
$25,000.00
Manila, Phillipines[sic]
-0-
10,000.00
10,000.00
CBS-TV Tape (Wild is Love)
-0-
6,000.00
6,000.00
CBC-Canada
10,000.00
20,000.00
10,000.00
Totals
$35,000.00
$86,000.00$0
$51,000.00
1962
Restaurant Senorita, Mexico
12,000.00
15,000.00
3,000.00
1963
BBC-TV
-0-
5,600.00
5,600.00
Australia
1,449.88
10,990.80
9,540.92
England
25,000.00
52,347.26
27,347.26
Orient
8,297.77
35,000.00
26,702.23
Totals
$34,747.65
$103,938.06$0
$69,190.41
1964
BBC-TV Re-run
-0-
$4,200.00
$4,200.00
The parties have stipulated that "if respondent prevails *226 on the PMSA issue, $11,000 shall be added to petitioners' income for 1964." Respondent increased petitioners' income as reported in 1960 by $5,600 designated "European Tour, English TV appearance," and $5,024.20 designated "New Victoria Theatre - London, England" with an explanation in substance the same as the explanation given for the increases for the years 1961 through 1964. On July 26, 1960, Associated Arts N.V. (AA) was incorporated under the laws of the Netherlands Antilles for the purpose of exploitation of the television tape made by petitioner in England in 1960. PMSA and ATV each owned 50 percent of the stock of AA. ATV continued to own 50 percent of the stock of AA until the middle of 1962 when it sold its AA stock for approximately $25,000 to another Netherlands Antilles corporation, World Minerals N.V. Petitioners had no ownership rights in nor any rights, power, direction or control over World Minerals N.V. World Minerals N.V. was managed by persons associated with the two lawyers who were officers of ABC. Capitol Records, Inc. (Capitol) was established in 1942 by Glenn Wallichs and several associates. Wallichs built Capitol into the third largest recording *227 company in the world within 20 years. Petitioner entered into his first contract with Capitol in 1942 and from that time earned substantial sums from and for Capitol. Effective April 1, 1951, contracts between petitioner and Capitol provided for deferred compensation. Under the deferred compensation provisions of these contracts, petitioner received a fixed amount each year as royalties and the excess of the royalties earned by petitioner over the amount to be disbursed to him by Capitol was retained by Capitol in its general fund to be paid to petitioner at the rate of $50,000 per year commencing April 1, 1962.
On April 1, 1962, the deferred compensation earned by petitioner but held by Capitol was approximately $1 million. Although the interest which could be earned from this sum was sufficient to enable Capitol to pay petitioner the sum of $50,000 per year without invading the corpus earned by petitioner in earlier years, Capitol was under no obligation to pay petitioner an amount in excess of retained earnings and that only at the rate of $50,000 a year until the total amount of such retained earnings without interest was exhausted. Petitioner's contract with Capitol expired *228 on April 1, 1961, but under the contract Capitol had an option to renew the contract for the period April 1, 1961 to March 31, 1962. Petitioners and their representatives knew the amount of the deferred compensation earned by petitioner and held by Capitol. They made some attempts prior to 1960 to obtain for petitioners greater benefits under the Capitol deferred compensation contract than return of the retained earnings at the rate of $50,000 a year. Prior to March of 1961, Capitol indicated to petitioner that it would exercise its option to retain petitioner's services until March 31, 1962, if the contract between them was not renewed. In discussions between representatives of Capitol and petitioner early in 1960, the representatives of Capitol stated that Capitol would make no adjustment in the then existing deferred-compensation provisions of the contract which it had with petitioner and would not increase the royalty of 5 percent to petitioner in a new contract. Although petitioner's representatives had offers from all the major recording companies to contract for petitioner's services upon the expiration of his contract with Capitol at royalties of from 10 to 12 percent, *229 petitioner refused to meet with any of the other companies because of his personal relationship with Wallichs. On the advice of his representatives, petitioner in the latter part of 1960 agreed that a company might be created to make his records provided the records were distributed by Capitol. The possibility of such an arrangement had been explored by petitioner's representatives at the time that PMSA, AA, and the trusts administered by the Arawak Trust Co. were coming into existence. At the time AA was created it was not contemplated by petitioner's representatives that it could be used to assist in solving the problem of increasing the amount petitioner would realize from his deferred compensation held by Capitol. In November 1960 petitioner authorized his representatives to investigate a possible deferred compensation contract between him and AA with more favorable terms than he was receiving from Capitol. An agreement between petitioner and AA was reached within a month and Capitol was informed of the agreement. At that time, Capitol's yearly gross receipts from petitioner's records were averaging between $4 and $5 million. As soon as Capitol was informed of the agreement *230 between petitioner and AA, representatives of Capitol sought threeway negotiations with petitioner and AA. These three-way negotiations resulted in contracts between Capitol and AA and between petitioner and AA and between Capitol and petitioner with respect to certain payments to be made by Capitol to AA.
The agreement, dated January 1, 1961, between Capitol and AA provided that AA would provide artists to Capitol and would pay for the cost of producing master recordings in exchange for receiving from Capitol full title and possession of all master recordings of artists presently under contract to AA and of artists who would become under contract to AA in the future. The master recordings to be received by AA included both those produced before and after January 1, 1961. AA gave Capitol the full and exclusive right to exploit the artistic works of the artists under contract to AA. In exchange for these rights, Capitol would pay AA a royalty of 5 percent with respect to masters recorded prior to 1961 and 6 percent for masters recorded after 1960, except as modified by any specific artist contract as long as the contract was effective and for so long thereafter as Capitol utilized *231 AA's master records. [5]
In addition *232 Capitol would pay AA a 4 percent royalty with respect to masters recorded after 1960 plus fixed amounts of $25,000 per month for the period January 1, 1961, to June 31, 1961, and $12,500 per month from July 1, 1961, to June 30, 1962. The additional 4 percent royalty was to terminate as of January 1, 1966, and the amount of the additional royalties and fixed monthly payments by Capitol to AA was not to exceed $400,000 for the 5-year period nor $200,000 for any Capitol fiscal year. The second agreement resulting from the three-way negotiations of December 1960 was a contract entered into between petitioner and AA dated February 20, 1961. This contract was to run for petitioner's life. The contract contained provisions that AA would have title to all masters of petitioner's recordings made under the contract. The provisions of the contract for payment by AA to petitioner were that commencing when petitioner's contract with Capitol expired as of March 31, 1962, AA would pay him $50,000 a year for life or for 25 years whichever were longer. This payment was to be made whether or not petitioner performed under his contract with AA. Petitioner in addition was to be paid $500 per minute *233 of recording time with a guarantee by AA to petitioner of 100 minutes of recording time a year for at least 3 years. The contract further provided that petitioner "shall not receive less United States dollar income then [he] would have received had the present Capitol Records, Inc. contract continued unchanged," provided AA continued to "show a profit of twenty-three per cent." The contract further provided that petitioner be paid $100,000 as additional one-time consideration. Under the contract petitioner assigned to AA all claim to compensation from recordings made except under his contract with AA and his rights in his deferred royalty contract with Capitol. The contract also contained provision for payments to petitioner for obtaining other artists for AA. Cole had sought to obtain from Capitol a contract substantially equivalent to that he obtained from AA but Capitol refused to enter into such a contract with Cole. On June 13, 1961, AA and Capitol entered into a specific artist contract covering the recording services of petitioner. The specific artist contract consitutes, in conjunction with the earlier agreements between Capitol and AA and petitioner and AA, a contract *234 for petitioner's services as a recording artist.This specific artist contract included a provision for payments due by Capitol to petitioner under his deferred compensation contract with Capitol to be made to AA and all other payments due by Capitol to Cole to be made to AA with Cole's express approval shown by his approval affixed to the agreement. During the years 1961, 1962, 1963, and 1964, Capitol's gross income on petitioner's records averaged between $4 and $5 million. AA requested Capitol to physically transfer all of the Cole master recordings Capitol held to the Netherlands Antilles in accordance with the terms of the agreement of January 1, 1961, between Capitol and AA. Some of these masters were moved to the Netherlands Antilles.
As contemplated by the specific artist contract of June 13, 1961, between Capitol and AA, Capitol retained possession and control of petitioner's deferred compensation account as accumulated by it up to and including March 31, 1962. On November 4, 1964, AA, because of a change in the tax treaty between the United States and the Netherlands, offered to return to Capitol the custody of all of petitioner's master records in return for Capitol's *235 relinquishing to AA the then balance of petitioner's deferred compensation fund of $871,717.13 in lieu of paying the amount to AA at the rate of $50,000 a year. This was agreed upon and Capitol paid AA the sum of $871,717.13 by the end of 1964. In addition to its contract with petitioner, AA had employment contracts with a number of other entertainers. It was also the sole stockholder of a heavy machinery leasing company and had financial interests in a publishing company, a mortgage lending company, a shopping center, and other enterprises. For the years 1961 through 1964, inclusive, the gross income received by AA in connection with its employment contract with petitioner constituted only 5 percent of its gross income from all sources. At the end of 1964, AA sold all of its contracts covering individual artists, writers, entertainers, and investors, including its contract with petitioner, to another Netherlands Antilles corporation, Koningsplein N.V. This latter corporation was wholly owned by one of the lawyers who was a director of ABC. Earlier in 1964 Koningsplein had purchased all of the stock of PMSA for $90,000.
Petitioner did not have any ownership rights, or any *236 right, power or direction over, or any interest in Koningsplein, at any time. Petitioner never was aware that AA sold its contract with petitioner to Koningsplein since at the time of the sale petitioner was hospitalized with terminal cancer and he died 2 months thereafter in February 1965. Respondent in his notice of deficiency to each petitioner increased or decreased petitioner's income from record royalties during the years 1961 through 1964 by the excess or deficit of the amounts paid by Capitol to AA over the amounts petitioners reported as having been received from AA with the following explanation: It is determined that you understated or (overstated) record royalties constructively received from Capitol Records, Inc. in your income tax returns for the years 1961, 1962, 1963 and 1964 by the amounts of $203,171.46, $ (29,961.69), $175,298.19 and $1,192,286.58, respectively. Taxable income is increased or (decreased) accordingly. Respondent's primary position with respect to the inclusion in petitioners' income of amounts received by PMSA in the years 1961 through 1964 and the inclusion in their income of the amounts paid by Capitol to AA in excess of the payments by AA to *237 petitioners during these same years is that the amounts were in substance petitioner's earnings and therefore includable in his taxable income under section 61. [6]
Respondent contends that PMSA was a sham which served no purpose other than collecting amounts earned by petitioner *238 and disbursing these amounts in payment of petitioner's expenses. In our view, the record does not support respondent's contention. PMSA supplied orchestral support, booking agents, and transportation for petitioner and paid petitioner $8,500 a week for his personal appearances whether or not a profit resulted from those personal appearances. In fact in 1960 PMSA suffered a loss from petitioner's European tour. The arrangement petitioner had with PMSA was comparable to his arrangements for personal appearances in the United States except that he received greater weekly compensation. Whether or not a corporation is a viable entity and warrants recognition for tax purposes or is a mere sham or dummy corporation is a factual determination. See Shaw Construction Co., 35 T.C. 1102 (1961) aff'd. 323 F. 2d 316 (C.A. 9, 1963). We find that PMSA was a viable corporation bearing entrepreneurial risk. Contrary to respondent's assertion, PMSA was contractually obligated "to furnish at no expense to Cole, a basic musical group and orchestra support for Cole's talents, such musical group and orchestral support being satisfactory to Cole." PMSA assumed risk on the Oriental tour made by *239 petitioner in 1961 when it employed a tour manager who contracted for transportation, housing, advertising and promotion in connection with the tour.Similar expenses were incurred by PMSA for petitioner's tour of Australia in 1963. We conclude that PMSA was not a sham or an "incorporated pocketbook" as respondent contends. Respondent further contends that even if PMSA was a valid taxable entity and not a mere sham, petitioner assigned his income to PMSA and is taxable on that income under the rule of Lucas v. Earl, 281 U.S. 111 (1930). As we stated in American Savings Bank, 56 T.C. 828, 839 (1971): * * * The well-seasoned case of Lucas v. Earl, 281 U.S. 111 (1930), and its progeny have caused the proposition that income is taxed to the person who earned it to become an axiom of tax law. The more difficult question, often shrouded in confusion, is the determination of who, in fact, is the real earner of the income. * * * In resolving a dispute over the identity of the true earner of income, we look to who controls the earning of the income. * * * While petitioner was the generator of whatever revenue PMSA might receive, PMSA paid petitioner a weekly salary of $8,500 for his services. *240 Whether or not PMSA earned a profit was, in our view, dependent on what efforts it made to sell tickets to the shows and on whether it could obtain the services required to produce its shows at a sufficiently low cost.The record shows that petitioner was not the person who made the arrangements for these services or sold the tickets. The activities of PMSA and not petitioner determined whether PMSA would make a profit. Accordingly we find that PMSA and not petitioner earned the income and incurred the losses in connection with the foreign tours of petitioner during the years in issue. Respondent's primary contention with respect to inclusion in petitioner's income of the amounts paid by Capitol to AA in excess of the amount paid by AA to Cole is that these sums were due to petitioner and even though petitioner attempted to assign these amounts due him to AA, the amounts are taxable to him under section 61. The payments made by Capitol to AA during the years 1961 through 1964 consisted of the following items: 1. The yearly payment of $50,000 made by Capitol to AA during the years here in issue under the three-way contracts of Capitol-Cole-AA. Capitol was obligated to pay Cole, *241 beginning at the termination of Cole's contract with Capitol, $50,000 a year of the deferred royalties which Capitol was holding until the entire amount of those royalties without any interest thereon was consumed. Since these royalties approximated one million dollars when the contract between Cole and Capitol was terminated, Capitol was required under the contract to pay to Cole $50,000 a year for 20 years to exhaust these deferred royalties. Under the Cole-Capitol-AA agreement, AA agreed absolutely to pay to Cole $50,000 a year for life or for 25 years, whichever was the longer period. In effect, in return for this agreement, Cole directed Capitol to pay the $50,000 a year due to him by Capitol for a 20-year period to AA. Considering this agreement as a whole, it is clear that the $50,000 a year for the 20 years that Capitol would be required to pay Cole was no more than a payment by Capitol to Cole through AA. The guarantee by AA to Cole of $250,000, or possibly more, in excess of the amount AA would receive from Capitol was consideration running to Cole from AA for Cole's changing his contract from Capitol to AA. If there is any assignment of income in connection with *242 the $50,000 in the years here in issue, it would not increase petitioner's reportable income under respondent's determination since the record shows that the $50,000 paid by Capitol to AA was paid by AA to Cole in each year here in issue and was reported by petitioners. 2. Under Capitol's contract with Cole, Capitol was obligated to pay to Cole, beginning upon the date of the termination of the contract (March 31, 1962), royalties of 5 percent on records, sold by Capitol after the termination of its contract, which were made from master recordings made by Cole prior to the termination of the contract. It is obvious that these royalties were also tied in with the ownership of and the rights to the master recording. Under the three-way contract, Capitol had agreed to turn over the masters made by Cole during the entire time Cole was under contract with Capitol to AA and on all records thereafter made from these masters and sold by Capitol to pay AA the 5 percent royalty which Capitol would have been required to pay to Cole had the three-way Cole-Capitol-AA agreements not been entered into. The record shows that Cole had no ownership of the masters which he made while under contract *243 with Capitol and Capitol's agreement to turn these masters over to AA was part of the consideration for AA's agreeing to Capitol's distribution of the Cole records to be made by Cole while under contract to AA. However, Cole did have an interest in the masters which in our view was a property interest. He had a right to a 5 percent royalty on all records made from these masters which were sold. In our view if Capitol had assigned the masters to another record manufacturer if that manufacturer produced and sold records from the masters Cole would have been entitled to the 5 percent royalty. However, neither Capitol nor an assignee of Capitol was required to produce and sell records from the masters and, if they did not, no royalties were due to Cole. At the date of the three-way Cole-Capitol-AA agreements there was no amount due Cole as royalties on records sold after the termination of the Cole-Capitol contract.
It is respondent's contention that Cole, in effect, assigned income due him by Capitol to AA and that under Lucas v. Earl, supra, this income should be taxable to Cole. In our view respondent has confused assignment of income which will be earned by the future personal *244 efforts of a taxpayer or income to which a taxpayer has a fixed right with the assignment of a contractual right. Stated in terms of Lucas v. Earl, supra, what petitioner here has assigned is the "tree" and not merely the "fruits." This contractual right which Cole had to royalties on records made under his contract with Capitol was assigned by Cole to AA in the three-way Cole-Capitol-AA agreements. Therefore, as Capitol made records from masters recorded by Cole prior to March 31, 1962, royalties were paid by Capitol to AA pursuant to the Cole-Capitol-AA agreements. The assignment by Cole to AA of his royalty rights from master records he had already made was part of the consideration for Cole's entire contract with AA. This contract included in addition to the guarantee of $250,000 of income in excess of the amount Cole would have received as deferred royalties from Capitol, $100,000 cash for entering into the contract and a payment of $500 a minute for recording time with a $50,000 minimum guarantee during the first 3 years. The contract between AA and Cole also contained miscellaneous benefits to Cole such as commissions on earnings from works of other artists that Cole obtained *245 for AA and a guarantee that Cole would not be paid less than he would have been paid had his contract with Capitol continued so long as AA made a 23 percent profit. The royalties here involved were not royalties to which Cole had an unrestricted right but rather royalties to which Cole had a contractual right if and when Capitol distributed records made from master recordings which Cole had made while under contract to Capitol. In Wood Harmon Corp. v. United States, 311 F. 2d 918, 921-922 (C.A. 2, 1963), the Court analyzed the cases dealing with the assignment of income as follows: In the tax lawyer's primer are the cases of Lucas v. Earl, 281 U.S. 111, 50 S.Ct.241, 71 L.Ed. 731 (1930); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Helvering v. Eubank, 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81 (1940), and Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055 (1941). In Lucas v. Earl, the Supreme Court held that the breadwinner could not shift the incidence of the income tax on his future personal earnings merely by contracting to pay part of them to his wife. In Horst, the Court held that the taxpayer who retained the ownership of a bond but gave *246 an interest coupon to his son was taxable on the interest collected by his son. In Eubank, the taxpayer was liable for the income tax on renewal commissions earned by him as an insurance agent, the right to collect which had been assigned to another. In Harrison v. Schaffner, the Court held that a voluntary assignment by the income beneficiary of a trust of a percentage of the succeeding year's trust income was an anticipatory assignment of income which remained taxable to the assignor. The philosophy underlying these cases is that the taxpayer has performed services or has a vested interest in property which gives him an unrestricted claim to compensation or income therefrom; the exercise of the unfettered power to dispose of that income is deemed analogous to its enjoyment or realization, resulting in a tax upon the assignor rather than upon the assignee who receives the income in fact. [5] [5] It has been stated that "the rule applicable to an anticipatory assignment of income applies when the assignor is entitled at the time of the assignment to receive the income at a future date and is vested with such a right." Cold Metal Process Co. v. Commissioner, 247 F. 2d 864, 873 (6th Cir. 1957) *247 (emphasis in original). As the Court in Wood Harmon Corp., supra, so clearly pointed out in its footnote to the statement we quoted, the rule applicable to an assignment of income applies when the assignor is entitled at the time of assignment to the income at a future date and is vested with such a right. In clear distinction to this type of case are those cases such as James F. Oates, 18 T.C. 570 (1952), aff'd. 207 F. 2d 711 (C.A. 7, 1953), and Ernest K. Gann, 31 T.C. 211 (1958), where the income which respondent was contending had been assigned were amounts which would become due only upon the happening of future events and the taxpayer had assigned his contractual right to such payments if and when they became due under the contract in return for some immediate or deferred payment. As we pointed out in Ernest K. Gann, supra, in order for a taxpayer to have constructively received income, such income must be actually available to him and he merely refuses to accept it himself, or if the case involves assignment, assigns the right to receive it to another. Where, as in the instant case, the amount is not due or subject to the taxpayer's demand but will only arise upon the *248 occurrence of a future event, the income is not constructively received by a taxpayer and an assignment of the contractual rights is not an assignment of income but of a contractual right. In our view the royalties, if any, on records made from master recordings made by Cole while under contract to Capitol were the income of AA from property it acquired from Cole for adequate consideration. 3. Part of the payments made by Capitol to AA during the years here in issue were on records made by Cole for AA under his contract with AA, which records were distributed by Capitol under Capitol's agreement with AA and a 6 percent royalty plus an extra 4 percent to a limited amount paid by Capitol to AA on the records so distributed. It is obvious that at the time of the Cole-AA-Capitol three-way agreement, Cole had no income rights of any type with respect to records to be made for AA, except to be paid by AA at the rate of $500 a minute of recording time for records so produced. The clear inference from the record is that Cole was so paid under his contract with AA and reported the amount which he received from AA under this Contract in his income tax returns for the years in which he received *249 the payments. At the time Cole entered into the contract with AA, he had no income rights with respect to records which he would make for AA. Those records were to belong to AA. Cole was being paid for his recording time and had no interest in the records produced. Here, as in the case of Fontaine Fox, 37 B.T.A. 271 (1938), the taxpayer had a contract with a corporation to do creative work for that corporation for a stated fee, the work to belong to the corporation. The corporation in its own business transaction disposed of the creative work done for it by its employee. Cole was paid at an amount agreed upon between him and AA for making records for AA and AA owned those records and chose to permit distribution of them by Capitol for a stated royalty. It could have been that the $500 a minute of recording time paid by AA to Cole for making the master records would have exceeded the royalties which AA received from Capitol. Had this been the financial result of the contract, AA would nevertheless have been obligated to make the $500 per minute of recording time payments to Cole. There was no contractual arrangement existing between Cole and Capitol with respect to master *250 recordings made after March 31, 1962, and therefore Cole had no present or future earnings with respect to these records to assign to AA. Fontaine Fox, supra. Cole was paid by AA for his work in making the recordings and the recordings were the property of AA. 4. The final item of payment by Capitol to AA which respondent contends should be included in petitioner's income under the philosophy of Lucas v. Earl, supra, is the $871,717.13 which was the amount of the balance of the Cole deferred royalties held by Captiol as of November 4, 1964, and which Capitol on that date paid to AA after negotiations between the two of them. At the time of the negotiations between AA and Capitol, the record shows that Cole was in the hospital with terminal lung cancer from which he died in February 1965, and had no part in or knowledge of the negotiations which transpired between Capitol and AA concerning the payment on November 4, 1964, of the $871,717.13 by Capitol to AA. In our view, the record is unmistakably clear that these negotiations between Capitol and AA were entirely in connection with Capitol's desire to obtain custody of Cole's master recordings and AA's being willing to transfer *251 the master records to Capitol in return for Capitol's paying to it the $871,717.13 in a lump sum instead of at the rate of $50,000 a year until the sum was exhausted, which was Capitol's only obligation under the then existing Capitol-AA-Cole agreements. Cole, under his agreement with Capitol had no right to obtain the $871,717.13 except at the rate of $50,000 per year. This right he had transferred to AA when the three-way Capitol-AA-Cole agreement was entered into in 1961. AA owned the masters made by Cole under his contract with it. Cole had no ownership of the master records made by him while under contract to Capitol. AA had obtained these master records under the Capitol-AA-Cole agreements entered into in 1961. Possession of the master records was valuable to Capitol and apparently particularly so in the light of Cole's physical condition in late 1964. The acceleration of the payment of the $871,717.13 to AA by Capitol was in consideration for Capitol's receiving the master records. We conclude that the $871,717.13 paid by Capitol to AA in 1964 is not includable in petitioner's income. While we have analyzed in detail the basis of our conclusion that there was no *252 assignment by Cole to AA of income owing to him from Capitol with respect to each category of income, we consider it appropriate to note other differences in the facts here present and the facts generally present in cases involving assignment of income. The record here is clear that neither Cole nor AA had any financial interest in Capitol. Likewise, the record shows that Cole had, at the time of entering the contract and during the subsequent years here in issue, no direct interest in AA. Half of the AA stock was owned by an entity totally unrelated to Cole and the other half was owned by PMSA, a corporation the stock of which was owned by a trust created by Cole for the benefit of his wife and children. [7] While the beneficiaries of the trust were the natural objects of Cole's affection and it could well be said that for this reason, in effect, in considering an assignment of income issue Cole should be considered as if he were the owner of PMSA stock, the fact still remains that even indirectly Cole only had a one-half interest in AA. The record also shows that AA had many interests and that its receipt of amounts from Capitol in connection with the Capitol-Cole-AA agreements *253 was a relatively small percentage of its income, being in the years here in issue on an average of approximately 5 percent. While none of these facts would warrant a conclusion that there was no assignment of income by Cole to AA, had Cole actually assigned his earnings to AA, these facts mitigate against the reasonableness of a conclusion that Cole would assign to AA except for adequate consideration any amounts due him. Cole reported in his tax returns for the years here in issue the payments he received from AA under his contract with AA. In an amendment to his answer in Docket Nos. 1745-71 and 1960-71, respondent alleges the following: 7. IN FURTHER SUPPORT of the determination that petitioner had additional income from royalties and professional performances, the respondent alleges: (a) In the statement attached to the statutory notice of deficiency *254 issued to petitioner, it is stated that income from Capitol Records royalties was constructively received and that certain income from professional performances was earned.
(b) In the alternative: Royalty income was deflected to Associated Arts, N.V. Income from performances outside the United States was directed to Presentaciones Musicales, S.A. The petitioner during the taxable years 1961 through 1964 also controlled Associated Arts, N.V. and Presentaciones Musicales, S.A. The amounts determined in the statutory notice were also a proper allocation under section 482 of the Internal Revenue Code of 1954. Petitioner contends that the issue under Section 482 is not properly before us since in order for respondent to rely upon section 482, he must inform the taxpayer to this effect in the statutory notice of deficiency. Petitioner in the alternative contends that respondent bears the burden of proof with respect to any section 482 reallocation because it is "new matter" raised in the answer as contemplated by Rule 32. Petitioner further in the alternative contends that he and neither PMSA nor AA were subject to common control within the meaning of section 482. We need not *255 decide any of these issues since in our view assuming that the section 482[8] issue is properly raised, that petitioner and PMSA and AA were subject to common control, and that we may hold section 482 inapplicable only if petitioner provesits application to be unreasonable, arbitrary, or capricious [See Pauline W. Ach, 42 T.C. 114, 126 (1964), aff'd. 358 F. 2d 342 (C.A. 6,1966), certiorari denied 385 U.S. 899 (1966)] the facts here are sufficient to sustain this burden of petitioner. Section 1.482-1(b) (1), Income Tax Regs. provides: *256 The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. The facts here show that petitioner's business transactions with PMSA during the years 1961 through 1964 were conducted at arm's length. Although a trust created by petitioner owned originally 49 percent and later all of the stock of PMSA, the corporation was managed when petitioner made his employment contract with it by the equitable owner of the 51 percent interest in PMSA, and the inference from the record is that petitioner's negotiations with the management of PMSA were arm's length. In reaching this conclusion we note that petitioner was guaranteed a salary of $8,500 per week for his tour of the Orient in 1961 and the same salary for his tours of Mexico, England, and Australia in 1962 and 1963. During these same years, petitioner was active in a tour of the United States *257 entitled "Sights and Sounds" in which he was paid $6,000 per week for essentially the same services for which he was paid $8,500 per week on foreign tours by PMSA. If petitioner wished to shelter his income earned on foreign tours from United States taxation, he would have arranged to be paid an artificially low salary. Respondent makes no contention that petitioner's salary from "Sights and Sounds" was other than adequate for the services rendered even though it was paid by a related company. On the basis of this record, we find that petitioner's salary from PMSA was equal to or greater than the salary he would have earned from a noncontrolled corporation for similar services. See L. E. Shunk Latex Products, Inc., 18 T.C. 940, 956 (1952). Accordingly, we find that with respect to petitioner's transactions with PMSA during the years 1961 through 1964, a reallocation of income under section 482 was unnecessary and was unreasonable, arbitrary, and capricious. Respondent contends that those payments made by Capitol to AA with respect to royalties on records recorded by Cole should be reallocated to petitioners under the provisions of section 482. Petitioner contends not only that *258 Cole did not have the requisite control over AA for the application of section 482 but also that his dealings with AA were at arm's length. As we have stated above, the purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Section 1.482-1(b) (1), Income Tax Regs.
The parties in this case stipulated as follows with respect to petitioner's contract with AA: Cole had sought to obtain from Capitol in the first instance a contract substantially equivalent to that which Cole ultimately obtained from AA. Capitol could have entered into such an agreement but Capitol refused to do so. It was on this basis that Cole entered into an agreement with AA rather than with Capitol. In our view this stipulation is tantamount to a stipulation that petitioner offered to deal with a totally unrelated party on the same basis that he dealt with AA. There is no suggestion in this record that petitioner had any financial interest in Capitol and the clear inference from the record as a whole is that he had no such financial interest. Under petitioner's contract with AA he obtained a $50,000 *259 a year payment for life or 25 years whichever were longer as compared to the 20 years during which he would receive $50,000 a year from Capitol under his deferred compensation contract. Petitioner received a $100,000 one-time payment and for at least 3 years a $50,000 guarantee on a $500 a minute recording time basis. Of course, petitioner was in a position to earn substantially more than $50,000 a year on the recording time basis if he recorded in excess of 100 minutes a year. In our view the evidence is sufficient to show the application of section 482 to petitioner's contract with AA to be unreasonable and arbitrary. We therefore hold section 482 inapplicable to petitioner's contract with AA.
Issues (3) and (4) Petitioner purchased all of the stock of the Channel Land Company, a California corporation (Channel) on October 10, 1960, for $130,000. Less than 2 months later, Channel elected to be taxed as a small business corporation. Channel's sole asset was a parcel of land. Its basis in this land was $61,112.85. Channel sold this land on April 21, 1961, for $130,000 in cash. The expenses of the sale were $706.75 which was included by Channel in its $61,112.85 basis of *260 the land. Channel distributed to petitioners the $130,000 receipt from the land sale. Channel had no accumulated earnings and profits at the time of the sale. Channel's only earnings and profits during the taxable year were from the sale of its land. Petitioners reported a "pass-through" long-term capital gain of $68,180.40 [9] on their 1961 tax returns in connection with the sale of this land. Petitioners also reported on their 1961 returns that their Channel stock was worthless and claimed a $130,000 long-term capital loss. The stock of Channel was worthless after its sole asset had been sold and the proceeds of that sale distributed to petitioners. Petitioners' attorney and accountant provided professional services in connection with petitioners' acquisition of the stock of Channel. They also provided professional services for Channel during the year in which petitioners owned Channel, and particularly they provided services with respect to the sale of the parcel of land. Channel had legal fees of $4,728.15 and accounting fees of $1,000 during the period it was owned by petitioners, which Channel *261 deducted as an ordinary and necessary business expense in 1961, its last year of operation. Petitioners on their tax returns treated the $5,728.15 as an ordinary loss on their ownership of Channel. Respondent in his notice of deficiency disallowed that amount of the reported long-term capital loss from the worthlessness of the Channel stock which exceeded $68,180.40. Respondent in his deficiency notice determined that the $5,728.15 was costs of petitioners' acquisition of Channel stock or Channel's sale of the land and therefore in effect should have reduced the gain on the sale of the land or have been a part of petitioners' basis in the Channel stock. The tax consequences of the distribution of the $130,000 to petitioners by Channel is governed by section 301. Inasmuch as Channel had earnings and profits of only $68,180.40, only that amount constitutes a dividend to petitioners, section 316(a), and this dividend was properly treated as long-term capital gain by petitioners. Section 1375(a). The remainder of the distribution, the amount of $61,819.60, is to be applied against and reduce the adjusted basis of petitioners' Channel stock. Accordingly, immediately following the *262 distribution, petitioners had received long-term capital gain of $68,180.40 and held stock with an adjusted basis of $68,180.40.
The Channel stock was worthless after the distribution. Accordingly petitioners suffered a loss of $68,180.40 within the purview of section 165(g) which treats such loss as a loss from the sale or exchange of a capital asset. In summary, petitioners' long-term capital gain of $68,180.40 is reduced by their long-term capital loss of the same amount. We sustain respondent's determination on this issue. With respect to the legal fees and accounting costs incurred by Channel during the period in which Cole owned the stock of Channel, petitioners have not presented sufficient evidence to show that these expenses were other than costs related to the acquisition by petitioners of the Channel stock or the disposition of the land by Channel. [10] The evidence indicates that the reason for the existence of Channel was to facilitate the sale of the 38 acres of land and that the expenses incurred during its final period of existence, that is when Cole was the owner of its stock, were solely directed to enabling the corporation to sell the property. There is no *263 breakdown of the fees connected with Cole's acquisition of the Channel stock and the legal fees and accounting expenses connected with the sale of the land. However, neither amount was an ordinary and necessary business expense but was costs incurred in acquiring a capital asset and in selling property. Therefore the amounts constituted a capital loss. Petitioners' contention that respondent's determination with respect to the loss on the worthlessness of the Channel stock is dependent upon a law which was not in existence at the time of the transaction is not correct. Though not referred to specifically, petitioners apparently allude to section 1378 which applies to a subchapter "S" corporation in certain cases where the corporation has over $25,000 per year in net long-term capital gain. While section 1378 applies *264 only to taxable years of electing small business corporations beginning after April 14, 1966 [Sec. 2(a), Pub. L. 89-389 (Mar. 8, 1966)], all of the sections which govern the tax consequences of petitioners' Channel transactions in 1960 and 1961 were effective as of January 1, 1958 [Sec. 64(a), Pub. L. 85-866 (Sept. 2, 1958)]. Issue (5) K.C. Records was incorporated in the State of California in February 1962. It employed recording artists, manufactured records, and distributed records. Petitioner was never employed by K.C. Records although he owned 60 percent of its shares when the company was formed. K.C. Records elected to be taxed as a small business corporation. At the end of its first fiscal year, January 31, 1963, the other stockholders of K.C. Records sold their shares in the corporation to petitioner for a nominal sum.
As of the first of the fiscal year beginning February 1, 1963, petitioner had contributed the amount of $916.91 to the capital of K.C. Records. During the fiscal year that ended January 31, 1964, petitioner contributed an additional $15,000 to this corporation's capital, giving him a total basis in his K.C. Records stock of $15,916.91. During that *265 same fiscal year, K.C. Records suffered a net operating loss of $41,571.76. K.C. Records did not have sufficient assets to pay its liabilities at any time during the fiscal year ending January 31, 1964. During that fiscal year, two loans from World Entertainers Ltd., totaling $20,000, were arranged by petitioner. These loans were $5,000 and $15,000, respectively, and the amounts went directly from World Entertainers to K.C. Records. The loans were made on petitioner's guarantee, and notes were executed after the loans were made by K.C. Records with petitioner's guarantee. The total of $20,000 was ultimately repaid by petitioners directly to World Entertainers, Ltd.
Petitioners owned 50 percent of Crestview Music Corp., 50 percent of Sweco Music Corp., and 50 percent of Comet Music Corp. During its fiscal year ending January 31, 1964, K.C. Records received $3,000 from Crestview, $2,500 from Sweco, and $1,000 from Comet. Each of these amounts was shown on the books of the lenders as loans to petitioner and was ultimately repaid by petitioners to each of the companies.
Respondent contends that petitioners are entitled to deduct in 1964 only $15,916.91 [11] as a net operating *266 loss of their subchapter "S" corporation, K.C. Records, Inc. Petitioners contend that they are entitled to deduct the full net operating loss of $41,571.76 because K.C. Records was indebted to petitioners in the fiscal year in issue for loans made to K.C. Records by other corporations owned in part by petitioners and for a loan from World Entertainers, Ltd. that was made on petitioner's sole credit, and that petitioners in fact repaid all of the obligations. Under section 1374 of subchapter "S" each person who is a shareholder of the subchapter "S" corporation is allowed as a deduction from his gross income, for the taxable year in which the taxable year of the corporation ends, an amount equal to his portion of the corporation's net operating loss. Each shareholder's *267 portion of the net operating loss is his pro rata share of the corporation's net operating loss, but section 1374(c) (2) places the following limitation on a shareholder's portion of net operating loss: (2) Limitation. - A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of -
(A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation). Both *268 parties agree that the adjusted basis of petitioners' stock in K.C. Records as of the close of the taxable year of the corporation ending January 31, 1964, without considering amounts advanced to K.C. Records by World Entertainers, Sweco Music, Comet Music, and Crestview Music, was $15,916.91. Respondent contends that petitioner's guarantee of K.C. Records' indebtedness did not constitute "any indebtedness of the corporation to the shareholder." We agree with respondent that a guarantee of an indebtedness to a corporation by a shareholder is not an indebtedness of the corporation to the shareholder, within the meaning of section 1374(c) (2) (B), even though such shareholder may be primarily liable on indebtedness of a corporation to a third party. Joe E. Borg, 50 T.C. 257 (1968). Until such time as a shareholder pays the indebtedness of the corporation on which he is the guarantor or comaker, there may be a liability of the shareholder to the lender but not a debt of the corporation to the shareholder. See Joe E. Borg, supra, and Milton T. Raynor, 50 T.C. 762 (1968). With respect to the loans to K.C. Records by World Entertainers, it is clear that petitioner was a guarantor and *269 K.C. Records was not indebted to petitioner but rather to World Entertainers. There is no evidence that petitioner paid the obligation of K.C. Records to World Entertainers during K.C. Records' taxable year ended January 31, 1964, thereby causing K.C. Records to become indebted to petitioner by subrogation. Accordingly, petitioner cannot include as a portion of the net operating loss of K.C. Records any portion of K.C. Records' indebtedness to World Entertainers. Ruth M. Prashker, 59 T.C. 172 (1972). Even though Sweco, Comet, and Crestview entered the amounts advanced to K.C. Records in their account books as loans to petitioner, there is no evidence that K.C. Records was indebted to petitioner for these advances rather than to Sweco, Comet, and Crestview. The evidence is not sufficient to show that Cole was other than a guarantor of the advances by Sweco, Comet, and Crestview of K.C. Records, and there is no evidence that petitioner paid the obligations of K. C. Records to Sweco, Comet, and Crestview during K.C. Records' taxable year ended January 31, 1964. Petitioners contend in the alternative that if they are not allowed to include as a portion of the net operating loss of *270 K.C. Records that portion representing loans guaranteed by petitioner, then they should be allowed the loss of K.C. Records for their taxable year 1964 as an ordinary business deduction. Petitioners contend that petitioner was engaged in the music business so extensively that his ownership of K.C. Records should come within the standard of his ownership of the company being his business. Petitioners contend that under these circumstances and considering the amount of K.C. Records' loss in its fiscal year 1964, the guarantee of the loans becomes a business loss in the ordinary sense and should be allowed. Respondent states that in order for petitioners to receive an ordinary deduction for petitioner's guarantee of these loans, petitioners must establish that the dominant motivation for petitioner's executing the guarantees was in furtherance of a trade or business of promoting record corporations rather than in furtherance of petitioner's interest in K. C. Records as an investor. United States v. Generes, 405 U.S. 93 (1973). From the record we conclude that petitioners have failed to establish that petitioner's relationship with K.C. Records was other than as an investor. Cf. *271 Whipple v. Commissioner, 373 U.S. 193 (1963). There is no evidence that petitioner guaranteed these loans for any other reason than to protect his position as an investor in K.C. Records. Accordingly, petitioner, when he paid the creditors of K.C. Records because of his guarantee of its loans, suffered a nonbusiness loss which cannot be offset against ordinary income. Section 166(d) (1) (B). Also, petitioners have presented no evidence that payment of the obligations of K.C. Records to World Entertainers, Sweco, Comet, or Crestview occurred during petitioners' calendar year 1964, the year in which petitioners claimed the deduction. Accordingly, respondent's determination with respect to this issue is sustained.
Issues (6) and (7) Al Baron and Steve Brody were television script writers. One of their scripts entitled, "Emilio," a comedy, was written for a proposed television series. Baron and Brody entered into an employment agreement with AA on May 10, 1961. Under the terms of this agreement, Baron and Brody assigned, among other things, their copyright to "Emilio" to AA. In addition, Baron and Brody agreed to participate, on AA's behalf, in five television or movie productions *272 over the next 10 years. The compensation under the contract for Baron and Brody was deferred payments of $12,000 per year beginning 12 years later, that is, May 1, 1973. In the fall of 1961 a contract was entered into between Baron and Brody, AA, and the American Broadcasting Company, the latter being one of the three principal television networks in the United States. The contract provided for the American Broadcasting Company to put up all of the money necessary to produce a pilot film of "Emilio," to undertake to sell the pilot film when produced, and to finance the series which it was hoped would follow. The obligations of the American Broadcasting Company were contingent upon the availability of the actor Buddy Hackett to pay the leading role in "Emilio." The contract further provides for AA to make available Baron and Brody as producers and directors of the pilot and the series. The American Broadcasting Company was to pay Baron and Brody for these 47 services directly. The contract further provided for a percentage participation in the profits of the entire project to be retained by AA. AA subsequently disposed of all its rights to the percentage participation under its *273 contract with the American Broadcasting Company to a joint venture which eventually consisted of PMSA, petitioner, Leo Branton (petitioner's lawyer) and Great Western Entertainers (GWE). AA received the amount of $130,000 for these rights. PMSA retained one-half of the rights outside the United States and the other participants in the joint venture shared pro rata in one-half the rights outside the United States and all of the United States' rights. The participants' contributions were as follows: GWE - $80,000; Branton - $15,000; petitioners - $35,000. PMSA contributed no money but undertook certain responsibilities for distribution of the series outside the United States. During all of November and December of 1961, an intensive effort was made to sign a contract with Buddy Hackett to play the lead in "Emilio." Buddy Hackett was in particular demand at the end of 1961 and his services were not obtained by AA. Similar efforts were directed toward other actors but none of the actors who were willing to play the role met the approval of the American Broadcasting Company. The American Broadcasting Company withdrew from the project in November of 1962. The partnership obtained *274 an extension of its rights to produce "Emilio" until August of 1963 but could not obtain financing by that date.
While Baron and Brody received no money directly attributable to "Emilio," they did receive payments on their contracts from AA over a period of several years in excess of $45,000. The sums received from AA by Baron and Brody were a consequence of their entire contracts with AA which included "Emilio" and all other activities in which Baron and Brody played any part under their AA contract. One of the participants in the joint venture which purchased the rights to "Emilio" from AA, GWE, was a corporation formerly known as Great Western Builders. On April 9, 1962, GWE entered into a joint venture with Kell-Cole Productions. Kell-Cole Productions was a California corporation which petitioners had acquired in August 1960. It reported its taxable income on a calendar year basis and elected to be taxed as a small business corporation for the year 1961 and subsequent years. GWE's contribution to its joint venture with Kell-Cole was its interest in "Emilio," that is eight-thirteenths of the United States' rights and eight-thirteenths of one-half of the non-United States' *275 rights in "Emilio." GWE further guaranteed to Kell-Cole a profit on "Sights and Sounds" of $5,000 per week for 30 weeks. Kell-Cole Productions assigned the profits, if any, of the Kell-Cole road show production of "Sights and Sounds" in excess of $150,000 to GWE. The profit above $150,000 which GSE was to receive and did receive was after all overhead and expenses incurred in the production had been paid and after petitioner had been paid $6,000 per week for his services.
Both the "Emilio" partnership interest and the "Sights and Sounds" project were speculative on April 9, 1962. The "Emilio" partnership interest ultimately proved to be worthless.A final partnership return was filed for the year 1963 showing a loss of $80,000 for GWE, $15,000 for Branton, and $35,000 for petitioners. "Sights and Sounds" proved to be successful and Kell-Cole paid $91,000 to GWE, which on its Federal tax returns reported $91,000 as income and $80,000 as a loss. Kell-Cole Productions deducted the $91,000 it paid to GWE on its 1963 tax return filed under the provisions of Subchapter "S". Respondent in his notice of deficiency determined that the $130,000 abandonment loss incurred in 1963 in connection *276 with the acquisition of television rights to "Emilio" in which petitioners participated was not incurred in a transaction entered into for profit and accordingly disallowed petitioners' claimed loss of $35,000 representing their distributive share of the joint venture loss on "Emilio." Respondent in his notice of deficiency further determined that the payments made by petitioners' wholly owned subchapter "S" corporation, Kell-Cole Productions, to GWE in the year 1963 were not incurred in a transaction entered into for profit and the claimed deduction was disallowed. Since Kell-Cole Productions was a subchapter "S" corporation respondent increased petitioners' income as reported by the $91,000 disallowed as a deduction as a production cost to Kell-Cole. Respondent contends that the money which petitioner paid to AA for an interest in "Emilio" constituted nothing more than petitioner's making a deposit in a foreign savings account. Respondent again asserts that petitioner controlled AA and the funds which petitioner paid to AA were subject to petitioner's bidding. Petitioners attack respondent's interpretation of the agreed upon facts and contend that "it is a strange savings *277 account that belongs 50 percent to a total stranger." The resolution of this issue depends upon the relationship of AA and petitioner. Petitioner was under an exclusive contract to AA and an irrevocable trust of which he was grantor held all of the shares of PMSA which owned 50 percent of the shares of AA. However, AA was far more than a mere vehicle for promoting Cole's financial interests. AA had interests in other entertainers and also in the construction industry, and in publishing and in shopping centers. AA sold its rights to the percentage participation in profits in "Emilio" to a partnership at a time when "Emilio" was a most speculative investment. Respondent relies on Gregory v. Helvering, 293 U.S. 465 (1935), arguing that the substance rather than form of the transaction between petitioner and AA with respect to "Emilio" should control. In our view, petitioners have shown by a preponderance of the evidence that their share of the "Emilio" partnership loss constituted a real loss in the amount claimed. The evidence as a whole shows that AA under the management of persons unrelated to petitioner was lessening its entrepreneurial risk with respect to "Emilio" by selling *278 the percentage participation interests to the partnership. Petitioner elected to purchase an interest in the "Emilio" partnership for $35,000 and when it became a worthless investment in 1963, petitioners suffered a real loss. The money which petitioner had paid to AA was not subject to his bidding in any manner whatsoever. Respondent in his brief contends that the agreement between GWE and Kell-Cole was nothing more than a subterfuge to permit GWE to recover the losses it incurred in investing in "Emilio." Respondent states his argument as follows: The plan, in form, was to have GWE join the Kell-Cole production of "Sights and Sounds" and share in the profits. * * * * * * The only reason apparent for the entire arrangement was to convert the return of a foreign deposit with Associated Arts to a domestic deduction for Kell-Cole.A deduction may not be claimed for the obligation owed by another person. Deputy v. Du Pont, 308 U.S. 488, 23 AFTR 808 (1940). This argument of respondent does not comport with the stipulated facts. The stipulated facts show that GWE was a corporation whose sole owner had no direct or indirect interest of any kind in Kell-Cole or any other of petitioner's *279 enterprises. The stipulation specifically states: GWE and Kell-Cole productions entered into a joint venture on April 9, 1962. GWE contributed to the joint venture the interest of GWE in the Emelio [sic ] partnership in which the partners were PMSA, GWE, Cole and Branton. * * *
Kell Cole Productions contributed to the joint venture a contingent but assigned participation in the profits, if any, of the Kell Cole road show production of "Sights and Sounds". GWE was to receive and did receive a share of the profits after all overhead and expenses incurred in the production had been paid and after Cole had been paid $6,000 per week for his services. Both the Emelio [sic ] partnership interest and the "Sights and Sounds" project were speculative on April 9, 1962. The Emelio partnership interest ultimately proved to be worthless. "Sights and Sounds" was successful and Kell Cole paid GWE $91,000. * * * In our view the stipulation clearly shows that GWE and Kell-Cole two unrelated entities, entered into a joint venture with respect to projects which were both speculative at the time. It happened that one of the ventures was successful and one unsuccessful. The $91,000 which Kell-Cole *280 paid in 1963 to GWE was the profit above the $5,000 a week for 30 weeks which GWE had guaranteed to Kell-Cole as a profit on "Sights and Sounds" and was GWE's part of the profit from "Sights and Sounds." It may have been that the amount should more properly have been shown on a joint venture return of the joint venture between GWE and Kell-Cole as GWE's part of the profit rather than by being deducted by Kell-Cole on its return. Apparently the $91,000 was deducted on Kell-Cole's return though the record is not specifically clear on this point. However, the $91,000 was GWE's income and not income of Kell-Cole. Therefore, we hold that respondent improperly increased petitioners' income by this $91,000 which he determined petitioner's subchapter "S" corporation, Kell-Cole received in 1963. Issue (8) General Artists Corporation (GAC) is one of the largest agency firms in the entertainment world and it acted as booking agent for petitioner. It was a common practice for GAC to make loans without interest to entertainers it represented, including petitioner.
"I'm With You," a proposed Broadway musical promoted by petitioner and produced by Kell-Cole Productions needed additional *281 funds in November 1960 and both GAC and Capitol Records initially refused to advance or invest any funds. Petitioner informed GAC that if GAC would make an investment in "I'm With You" he would guarantee GAC against loss. Capitol Records then agreed that it would advance $60,000 for "I'm With You" and it did so. The understanding was that GAC would repay Capitol the $60,000 and GAC did so. Kell-Cole Productions, a Subchapter S corporation wholly owned by petitioner, executed a promissory note on July 27, 1961 in the amount of $60,000 payable to GAC. Petitioner guaranteed the payment of the promissory note. This note replaced a prior agreement of November 15, 1960, pursuant to which GAC was to receive 10 percent of petitioner's record royalties until it had recovered the $60,000. "I'm With You" was abandoned in 1962. Sixty Thousand Dollars was paid to GAC by four checks: a check for $5,000 in early 1961; a Kell-Cole Productions' check for $15,000 dated January 1, 1962, and two personal checks from petitioners for $20,000 each, dated May 22, 1963 and December 30, 1963. [12] The $60,000 advanced by 54 Capitol for the production "I'm With You" had been used in the unsuccessful attempt *282 to produce "I'm With You." Kell-Cole Productions deducted in 1961, 1962, and 1963 as "commissions paid" the payments made by its checks or petitioners' checks to GAC in payment of the $60,000 note given by Kell-Cole Productions to GAC. Respondent disallowed as deductible business expenses of Kell-Cole the payments made on the GAC note by Cole and Kell-Cole. These disallowances increased petitioners' income from its subchapter S corporation in the years 1961, 1962, and 1963. Respondent contends that the transaction involving GAC was nothing more than a loan by GAC to Kell-Cole and that the repayments of the loan by Cole and Kell-Cole, Cole's wholly-owned subchapter S company, are not deductible. Respondent's contention is logical and correct. Kell-Cole's expenditure of the $60,000 should be and insofar as this record shows is reflected in its profit and loss account in connection with its business operations, which included *283 its unsuccessful attempt to produce "I'm With You." The repayment of the borrowed funds to GAC would not affect its profit and loss account. In fact, the loss of the $60,000 should properly be otherwise deducted by Kell-Cole and to allow it to also deduct the repayment of the loan would give Kell-Cole a double deduction for the $60,000. A repayment of borrowed funds is not a deductible expense.
The record shows that the advancement of the $60,000 by GAC was a loan to Kell-Cole and not an investment by GAC in "I'm With You." GAC demanded assurances that it would be repaid its full $60,000, no more and no less. GAC did not intend to assume any risk and the evidence as a whole shows that it did not. We sustain respondent's determination with respect to this issue. Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Nathaniel Cole, Deceased, Maria Cole Devore, Executrix, and Maria Cole Devore, Surviving Spouse, docket No. 1759-71, and Maria Cole Devore, docket No. 1760-71. ↩
2. All references are to the Internal Revenue Code of 1954. 3. For the year 1962 Cole's income as reported was reduced by respondent by $29,961.69. Respondent made this adjustment apparently for the reason that payments in this year by Associated Arts, N.V. (AA) to Cole exceeded the payments by Capitol Records, Inc., to Associated Arts, N.V. in 1962. ↩
4. The stipulation of facts consists of 80 pages of narrative and 107 joint exhibits, some of which are contracts, trust agreements, or other lengthy documents. 5. A master record has great value because it is the physical asset required to make duplicate copies for sale to the public. While there is no specific statement in the stipulation with respect to the value of previously made and newly recorded masters from the same artist, the inference from the dealings between Capitol and AA is that the old masters made by Cole became much more valuable when it became apparent in 1964 that he would not recover from his illness with lung cancer.It would appear that while Cole was able to make new recordings, the old records did not produce comparatively for Capitol much revenue. The parties stipulated that "Capitol's gross on Cole records was averaging, during the years at issue between four and five million dollars, and the six per cent royalty was averaging between $200,000 and $250,000." Since AA was paid a 6 percent royalty only on recordings made by Cole after the effective date of the Cole-AA contract, it appears that only a small portion of Capitol's sales during the years here in issue was from master recordings made by Cole while under contract to Capitol on which Capitol paid only a 5 percent royalty. ↩
6. While the parties have stipulated that there were in many instances Federal income tax advantages to many large corporations as well as to authors, artists, and other individuals in transacting business through Netherlands Antilles corporations, we consider it worth noting that when the trust created by Cole for his wife and children sold its PMSA stock for $90,000 in 1964, Cole had no remaining even indirect interest in either PMSA or AA. Therefore, Cole never received even indirectly the benefits of amounts received by either PMSA or AA from exploitation of his work except from the salary and other payments which he received from these corporations and reported on his Federal income tax returns in the years here in issue and whatever gain resulted to the trust he had created from its sale of the PMSA stock, a minor amount compared to the amounts of income respondent contends Cole assigned to PMSA and AA. ↩
7. The parties have stipulated as follows with respect to the trust which held the PMSA stock: Arawak acted both as a trustee and as a company manager. When acting as a trustee, Arawak acted at all times and in all respects with full fidelity and integrity to its fiduciary responsibilities under the governing trust documents, * * * ↩
8. Sec. 482, I.R.C. 1954 provides that : In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. ↩
9. This figure was stipulated but differs from the figure on the returns. ↩
10. While respondent's position is that these expenses were a part of the cost of the acquisition by petitioners of their stock or of the sale of the land by Channel, he treats the items in the notice of deficiency as an additional capital loss with the same substantive result. Petitioners on their tax returns had in effect treated the item as an ordinary loss. ↩
11. Respondent determined in his statutory notice of deficiency that petitioner's basis in his K.C. Records, Inc. stock plus the loans made by him to K.C. Records totaled $6,000 in 1963 and zero in 1964. The issue for our decision involves only the year 1964 and respondent now contends that the sum of petitioner's basis in the K.C. Records stock plus his basis in loans extended to K.C. Records is $15,916.91 in that year. ↩
12. There is no showing why petitioners instead of Kell-Cole made these payments and no contention is made by petitioners that they sustained a loss as a guarantor of Kell-Cole's note or that Kell-Cole was unable to repay them the $40,000 paid by their checks. ↩