Frederick H. FOGLESONG, Elizabeth C. Foglesong, and Frederick H. Foglesong Co., Inc., Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Nos. 79-1749, 79-1750.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1980.

Decided April 29, 1980.

James J. Shrager, Newark, N.J., for petitioners-appellants.

Michael J. Roach, Tax Div., Dept. of Justice, Washington. D.C., for respondent-appellee.

Before TONE, WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This is an appeal from a decision of the United States Tax Court, 35 T.C.M. 1309 (1976), determining that the bulk of the commission income of a personal service corporation, Frederick H. Foglesong Co., Inc. (the "Corporation"), set up by a steel tubing sales representative, Frederick H. Foglesong (the "taxpayer"),[1] was taxable to the taxpayer and not to the Corporation. The Tax Court for various reasons, which will appear, chose essentially to disregard the corporate form and, under Section 61 of the Internal Revenue Code[2] and the assign-

---

1. Elizabeth C. Foglesong, taxpayer's wife, is a party to this appeal solely because she and her husband filed joint federal income tax returns for the taxable years in question.

2. I.R.C. § 61(a) (26 U.S.C.) provides in relevant part:

    . . . gross income means all income from whatever source derived . . . .

ment of income doctrine of *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930), to treat the bulk of the commission income as having been earned by, and as taxable to, the taxpayer. The Tax Court thereupon determined that there were deficiencies in the taxpayer's income tax for the taxable years 1966 through 1969 in the total amount of $161,179.15. We reverse and remand.

## I.

The facts here are not in substantial dispute. Frederick H. Foglesong, the taxpayer, was a sales representative for the Plymouth Tube division of the Van Pelt Corporation ("Plymouth Tube") and for the Pittsburgh Tube Company ("Pittsburgh Tube"), two manufacturers of cold drawn steel tubing. Taxpayer entered into an agreement to become the Eastern sales representative of Plymouth Tube in 1962. He sold Plymouth Tube's products within a defined territory for a commission. In 1963, taxpayer entered into a similar agreement with Pittsburgh Tube.

As a sales representative, taxpayer sought out prospective customers for steel tubing and tried to persuade them to use the products of Plymouth Tube or Pittsburgh Tube in their manufacturing processes. Taxpayer answered technical questions about the products he was selling, and after his customers had placed orders, he was available to respond to questions and to service any complaints. There was evidence that taxpayer had an impressive reputation as a salesman, and this was one of the principal reasons he was retained as a sales representative by Plymouth Tube and Pittsburgh Tube.

On August 30, 1966, taxpayer incorporated his business as Frederick H. Foglesong Company, Inc. He, his wife and his accountant were listed as the incorporators on the certificate of incorporation. Of the one

hundred shares of common stock issued by the Corporation (for a total subscription price of $1,000), taxpayer held 98 shares and his wife and accountant held 1 share each. The Corporation paid no dividends on its common stock during the taxable years in question, 1966 through 1969.

The Corporation also issued preferred stock to the taxpayer's four minor children (for which the total subscription price was $400). The four children received dividends totaling $32,000 [3] over the period beginning September 1, 1966 and ending December 31, 1969.

At or about the time the Corporation was organized, the taxpayer notified Plymouth Tube and Pittsburgh Tube that the Corporation was being formed and asked that any commissions due under his agreements with them be paid to the Corporation. Both suppliers agreed to this request. As a result, certain commissions earned for services rendered before the date of incorporation were paid to the Corporation. In addition, the Corporation adopted a fiscal year ending August 31, and the taxpayer received no salary from the Corporation during the months of September through December 1966 although he continued to work as a salesman servicing Plymouth Tube and Pittsburgh Tube during that period.

On his personal income tax return for the calendar year 1966, taxpayer reported a net profit from his business as a sales representative in the amount of $86,665.88, all of which was derived from commissions paid to him personally during the months of January through August, 1966, by his principals. The Corporation made its first salary payment to taxpayer on January 9, 1967, and he received a regular monthly salary after that date during the years which are relevant here. Taxpayer's salary income from the Corporation during calendar year 1967 was $56,500. In that year and in the

All references to the Internal Revenue Code are to the Internal Revenue Code of 1954, as amended.

**3.** The $32,000 figure appears in the government's brief; the Tax Court stated the total

amount of the dividends received by taxpayer's children to be $38,000. The abbreviated record filed in this appeal contains no reference to the exact amount of the dividends.

succeeding relevant calendar years, he reported no personal income from any business as a sole proprietor. The respective net receipts of the Corporation from sales commissions and its deductions for compensation paid to taxpayer for the four taxable years in question are as follows:

| Taxable Year Ending | Net Receipts from Commissions Before Payment of Compensation to Taxpayer[4] | Compensation to Taxpayer Deducted |
| --- | --- | --- |
| August 31, 1967 | $148,486.70 | $41,500.00 |
| August 31, 1968 | 100,482.23 | 55,000.00 |
| August 31, 1969 | 99,429.35 | 65,000.00 |
| August 31, 1970 | 121,018.24 | 73,700.00 |

After the formation of the Corporation, all commissions from Plymouth Tube and Pittsburgh Tube were paid to the Corporation. But a written agreement with Pittsburgh Tube was not executed until May 19, 1969, or with Plymouth Tube until January 1, 1971.

Taxpayer testified that he wished to incorporate his business in order to obtain the limited liability protection afforded by a corporate structure and also to provide a better vehicle for his planned expansion into several new business ventures. Subsequent to the formation of the Corporation, taxpayer interviewed a prospective salesman to help him in the New England area, but these negotiations were unsuccessful. The Corporation did, however, employ a secretary during its taxable years ending August 31, 1969 and 1970, paid her a salary and took corresponding deductions. Taxpayer asserted that he had unsuccessfully attempted to expand his sales business into other areas such as steel warehousing, transportation of steel tubing and the exporting of steel tubes to Europe but produced no documentation of these efforts.

The Corporation paid taxpayer a regular salary as a salesman, paid all of taxpayer's expenses incurred in connection with his sales activities, maintained a bank account, carried its own insurance coverage, maintained a company automobile and complied with all the formalities required of corporations in the state of New Jersey. The Corporation adopted bylaws, held an initial meeting of incorporators, at which the board of directors was elected, and conducted periodic board of directors' and stockholders' meetings as required by its bylaws. Taxpayer served as chairman of the board of directors as well as president and treasurer of the Corporation.

During the years in question here taxpayer did not enter into any written employment contracts with the Corporation nor did he enter into a covenant not to complete with the Corporation.

During these years taxpayer's only gainful activity was as an employee of the Corporation. He had no legal rights under the representation contracts with Plymouth Tube and Pittsburgh Tube subsequent to the formation of the Corporation.[5] Taxpayer testified that during the period at issue he did not engage in any business activity other than as an employee of the Corporation.

The Tax Court, *inter alia*, concluded on balance that, although there was no attempt by taxpayer to form a corporation to take advantage of losses incurred by a separate trade or business, tax avoidance considerations "far outweighed any genuine business concerns taxpayer may have had in setting up [the Corporation]." Nonetheless, the Commissioner conceded, and the Tax Court found, that the Corporation was a viable, taxable entity and not a mere sham during the years in issue.

But, in spite of its finding of viability (and strongly influenced by the apparent flagrancy of the tax avoidance), the Tax Court, in effect, substantially disregarded the Corporation for tax purposes. It found

---

4. These figures show the total net commission income (before payment of compensation to taxpayer) as reported by the Corporation on its tax returns for the taxable years in issue. They thus include the income generated on certain sales made within the Corporation's exclusive sales territories, but without any selling effort on taxpayer's part. Approximately two percent of the total commissions received by the Corporation during the taxable years in question resulted from these exclusive territorial arrangements. *See infra* at 868.

5. *See* n.8, *infra*.

that during the years in question control over 98% of the commission income remained with taxpayer so as to cause such income to be taxable to him (as the person who earned it through his personal sales efforts) and not to the Corporation. The Tax Court based this result on Section 61 of the Internal Revenue Code and the assignment of income doctrine of *Lucas v. Earl, supra*.[6] With respect to those commissions which were received by taxpayer solely because of the exclusive territorial rights assigned to the Corporation under its agreements with Plymouth Tube and Pittsburgh Tube (amounting to approximately 2% of the total), the Tax Court held that the Corporation, not the taxpayer, was the party earning this income, and, hence, such commissions should be taxed to it.

The Tax Court found it unnecessary to reach the question whether the Commissioner was authorized to allocate the commission income to taxpayer under Section 482 of the Internal Revenue Code, which permits the Commissioner to reallocate income and expenses among commonly controlled "organizations, trades or businesses." [7]

## II.

Personal service corporation tax cases reveal a tension between "the principle of a graduated income tax * * * and the policy of recognizing the corporation as a taxable entity distinct from its shareholders in all but extreme cases." *Rubin v. Commissioner*, 429 F.2d 650, 652 (2d Cir. 1970).

The impact of the graduated income tax is eroded when income is split artificially among several entities or over several tax years. The assignment of income doctrine under Section 61 of the Internal Revenue Code (as formulated in *Lucas v. Earl*) seeks to recognize "economic reality" by cumulating income diffused among several recipients through "artificial" legal arrangements. The attribution of income to its "true earner" is simply a species of recognizing "substance" over "form." *See Rubin, supra*, at 653.

But, if the issue is one of attributing the income of a corporation to its sole stockholder-employee who "really" earned it, we encounter the important policy of the law favoring recognition of the corporation as a legal person and economic actor. As Mr. Justice Holmes said in *Klein v. Board of Supervisors*, 282 U.S. 19, 24, 51 S.Ct. 15, 16, 75 L.Ed. 140 (1930):

> But it leads nowhere to call a corporation a fiction. If it is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members.

In the instant case, the following circumstances, among others, are present: (1) the Corporation and not the taxpayer is the party to the contracts under which services are performed,[8] (2) the Corporation is recognized to be a viable, taxable entity and not a mere sham, (3) non-tax business pur-

---

**6.** *Lucas v. Earl* involved a contract between husband and wife which declared all property which they were to receive to be taken by them as joint tenants. The husband received salary and attorneys' fees and was the only party to the contracts by which the salary and fees were earned. The Supreme Court held that half the husband's personal service income could not by the contract be assigned to the wife for tax purposes. Mr. Justice Holmes noted that the arrangement was one by which "the fruits are attributed to a different tree from that on which they grew." 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731.

**7.** The Tax Court also held that the Corporation was not a personal holding company as defined

in Section 542 of the Internal Revenue Code. The Commissioner has not appealed that determination, and it is not before us.

**8.** The Tax Court found that "under general principles of contract law, and specifically under New Jersey law, the facts before us clearly establish that a novation occurred whereby Foglesong Co. was substituted for petitioner [Fred Foglesong] as a party to the sales contracts with both Plymouth and Pittsburgh [at or about the time of its incorporation]. We view the contract Foglesong Co. signed with Pittsburgh on May 19, 1969, and the one entered into with Plymouth on January 1, 1971, as mere formal ratifications of this prior substitution."

poses are present even though tax avoidance is apparently a major concern,[9] (4) the Corporation has not been formed for the purpose of taking advantage of losses incurred by a separate trade or business, (5) the corporate form (and the status of the Corporation as an actual operating enterprise) has been consistently honored by the taxpayer and other parties to the transactions giving rise to the income, (6) the taxpayer does not render services as an employee to any entity other than the Corporation, (7) the Corporation is not disqualified from performing the Services required of it by contract because the law requires these services to be performed by an individual, (8) the entities paying or providing the income are not controlled or dominated by the taxpayer, and (9) as will appear, other and more appropriate legal bases exist for attacking apparent tax avoidance than broad-scale disregard of the corporate form through application of assignment of income theory. We note especially that the Tax Court did not find the Corporation to be a pure tax avoidance vehicle.[10]

Under the circumstances of the instant case, we think it inappropriate to attempt to weigh "business purposes" against "tax avoidance motives" in a determination whether the assignment of income doctrine of *Lucas v. Earl* should apply, in effect, to substantially disregard the corporate form. Ostensibly this inquiry has been made in order to question the validity of a *transaction* purportedly entered into by a corporation, rather than the validity of the corporation itself. *Cf. Rubin v. Commissioner*, 51 T.C. 251, 266, n.19 (1968), *rev'd and rem'd*, 429 F.2d 650 (2d Cir. 1970), *opinion on remand*, 56 T.C. 1155 (1971), *aff'd*, 460 F.2d 1216 (2d Cir. 1972) (per curiam).[11] But to apply *Lucas v. Earl* in this fashion under the circumstances present here is effectively (and more realistically) to nullify the determination that the Corporation is a via-

ble, taxable entity and not a sham. *See Moline Properties v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *National Carbide v. Commissioner*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).

In *Moline Properties v. Commissioner, supra*, the Supreme Court confronted the question whether the gain on sale of certain real estate held by a corporation as security was to be taxed to the corporation or to its sole shareholder. The Court perceived the problem as determining whether the corporate form might be disregarded for tax purposes as a sham or unreal. The Court said that the corporation was a viable taxable entity *so long as the purpose of its creation is the equivalent of business activity or its creation is followed by the carrying on of business by the corporation*. In *Moline Properties*, the question of purpose to evade or avoid income taxes (through the use of a corporation) was addressed as part of the theretofore live issue whether the corporation was a viable taxable entity or a sham. Although, as a practical matter the "viability" objection has apparently now fallen into general disuse, the *Moline Properties* analysis is still fundamental. *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 429–30, 69 S.Ct. 726, 730, 93 L.Ed. 779 (1949). *See also Siegel v. Commissioner*, 45 T.C. 566 (1966); *Bass v. Commissioner*, 50 T.C. 595 (1968). We think it inappropriate, in light of *Moline Properties* and *National Carbide*, except on more extreme facts than appear here, to achieve, through recourse to the assignment of income doctrine, essentially the same result as would follow from treating the Corporation as a "sham" for tax purposes. *See also New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348 (1934).

The instant case is not unlike the early case of *Fontaine Fox v. Commissioner*, 37

---

**9.** Actual or potential purposes served by the Corporation here included the provision of limited liability and the furnishing of a vehicle for subsequent expansion of the business.

**10.** *Cf. Jones v. Commissioner*, 64 T.C. 1066 (1975).

**11.** Hereafter, only the various Tax Court and Second Circuit opinions in the *Rubin* case relevant to particular discussions herein will be cited; citations of the case's entire procedural history will be omitted.

B.T.A. 271 (1938), where a cartoonist transferred to his corporation his cartoon copyrights and various contracts pursuant to which he earned royalties and entered into an agreement with the corporation to render his services exclusively to it for a fixed salary. The corporation, in turn, made a contract with a distributor, who made payments to the corporation based on the percentage of sales of newspapers carrying taxpayer's cartoons. In *Fontaine Fox*, the Board of Tax Appeals distinguished *Lucas v. Earl* on the grounds that, rather than an assignment of income, *Fox* involved an assignment of property (the contracts with distributors); subsequent income arising from such property was income not of the assignor but of the assignee. *Accord, Laughton v. Commissioner*, 40 B.T.A. 101 (1939), *rem'd*, 113 F.2d 103 (9th Cir. 1940).[12]

Although we do not regard the point as decisive, the Tax Court here found that, with respect to the contracts to perform sales services for Plymouth Tube and Pittsburgh Tube, there had been not only an assignment but a novation, with the corporation's becoming the sole party obligated to perform sales services and entitled to be compensated for such performance. Hence, this case is in essential concept quite distinguishable from *Lucas v. Earl*, where only income was assigned, and cannot be plausibly distinguished from *Fontaine Fox*, where the service contracts were assigned. Here not only the fruit but the tree itself was transferred to the Corporation.[13]

In *Rubin v. Commissioner*, 51 T.C. 251 (1968), the Tax Court held that income was taxable to an individual who owned a 70% interest in a personal service corporation, which performed management services for another company. The same individual also controlled the company for which services were to be performed. The Tax Court attempted to analyze the problem both as one

in which form differed from substance (the individual being held to work "directly" for the company) and in which the earning of the income was controlled by the individual rather than his corporation and was, therefore, taxable to the individual under the doctrine of *Lucas v. Earl*. In *Rubin*, the Tax Court suggested that the difference between the form over substance analysis and the assignment of income approach was only semantic. Thus it attempted to determine whether the form of the transaction, involving the personal service corporation, served any economic purpose and also whether the individual, in fact, controlled the earning of the income. The Tax Court found, first, that the income was properly taxable to the individual and distinguished both *Fox* and *Laughton* on the grounds that in *Rubin* the taxpayer was not contractually bound to (and in fact did not) render services exclusively to the personal service corporation (as he was bound to and did in *Fox* and *Laughton*). Second, in *Rubin*, the taxpayer controlled not only the personal service corporation, but also the corporation to which services were rendered; in *Fox* and *Laughton* only the personal service corporations themselves were controlled.

On the second point—taxpayer's control of the company receiving services—the instant case is like *Fox* and *Laughton* in that taxpayer here had no control over Plymouth Tube and Pittsburgh Tube. On the first point, although taxpayer here was not contractually bound to render services exclusively for the Corporation, he did in fact do so.

*Rubin* was later reversed on appeal by the Second Circuit, through Judge Friendly, who was of the view that "references to 'substance over form' and the 'true earner' of income merely restate the issue in cases like this: Who is the 'true earner'? What is

---

**12.** *Laughton* was remanded for consideration "whether Laughton's hiring of himself to [a personal service corporation] for a salary substantially less than the compensation for which the corporation supplied his services as its employee to various motion picture producers, constituted, in effect, a single transaction by Laughton in which he received indirectly the

larger sum paid by the producers." 133 F.2d 104. The Ninth Circuit relied on *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940), decided after the Tax Court decision.

**13.** *Cf. Damm v. Commissioner*, 36 T.C.M. 793 (1977).

substance and what is form?" *Rubin v. Commissioner*, 429 F.2d 650, 653 (2d Cir. 1970). Judge Friendly felt that Section 482 of the Internal Revenue Code (providing for reallocation of the gross income of controlled taxpayers) was a more appropriate tool for use in this kind of case than "common law" tax doctrines such as assignment of income under *Lucas v. Earl.* In any event, Judge Friendly believed that the two bases on which the Tax Court distinguished *Fox* (and *Laughton*) were not relevant with respect to § 61 of the Internal Revenue Code. *Rubin, supra* at 654.

We think that the Tax Court determination in *Rubin* might be easily distinguished here on the grounds that the taxpayer in the instant case worked exclusively for his personal service corporation (although he was not under contract to do so). Further, he did not own or control Pittsburgh Tube or Plymouth Tube, the entities to which services were rendered. Fundamentally, however, we believe that both *Rubin* and the instant case are more like *Fox* and *Laughton* than they are unlike those leading cases. In the resolution of the instant case we accord considerable deference to Judge Friendly's holding in *Rubin.*

The Tax Court also relies heavily here on *American Savings Bank v. Commissioner,* 56 T.C. 828 (1971), where Harry and Carl Hagemann were the sole stockholders of Cedar Investment Company ("Cedar") which rendered management services (through Harry and Carl) to American Savings Bank. The Tax Court found that between Cedar and Harry and Carl:

> The absence of any employment relationship, either written or oral, *together with no fees, wages, salary, or other payments made by Cedar to the individuals* and the lack of any reference to Carl and Harry as agents or employees in Cedar's corporate minutes or other documents, are persuasive factors weighing against the existence of any agency or employment relationship between Cedar and the individuals. 56 T.C. 842 (emphasis supplied).

On this basis, the Tax Court decided that income from services was properly Harry's and Carl's rather than Cedar's and that "there [was] an obvious breach in the relationships of the entities involved. . . ." 56 T.C. 842. While, in the instant case, a formal employment contract for taxpayer is lacking, the employment "relationship" seems fully intact.[14]

*Roubik v. Commissioner,* 53 T.C. 365 (1969), on which the Tax Court also relies, involved a professional corporation consisting of four radiologists, where the question raised was whether the business of the four principals was carried on by the corporation or outside it. In *Roubik,* the individual radiologists, not the corporation, maintained contractual relationships with the institutions for which services were rendered. The corporation did not own equipment nor did it incur the great bulk of operating expenses. It did not assign its shareholders to institutions or to tasks. In short, the corporate form was repeatedly flouted. Indeed, it would be fair to say that the corporation was not an operating enterprise and, in fact, to conclude (although the Tax Court did not do so in *haec verba* ) that the corporation was a sham.[15] The instant case is clearly distinguishable in that the Corporation here assumed the contractual obligation to provide sales services for Pittsburgh Tube and Plymouth Tube, paid any expenses that were associated with the rendition of such services and otherwise honored the corporate form with respect to all matters of operating concern. Unlike *Roubik,* the Tax Court has specifically found here that the Corporation is not a sham and is a viable taxable entity.

---

14. In addition, the two previously indicated factors upon which the instant case might be distinguished from the Tax Court's determination in *Rubin, i. e.* the absence of exclusiveness of employment and control of both corporations, were also present in *American Savings Bank.* 56 T.C. 828, 841 (1971).

15. *See* Battle, *The Use of Corporations by Persons Who Perform Services to Gain Tax Advantages,* 57 *Taxes* 797, 804 (1979).

Another type of case clearly distinguishable from the case at bar is illustrated by *Jones v. Commissioner*, 64 T.C. 1066 (1975), where an individual set up a professional service corporation, with himself as the sole shareholder and only employee, to carry on work as an official court reporter of a federal district court. In that case, the individual and not the corporation was held to be the "true earner" of the income, primarily because federal law required that court reporting services be performed by an individual, not a corporation. Thus, in *Jones*, the corporation was legally disabled from performing the work and earning the income; no such infirmity affected the corporation here. *See also McIver v. Commissioner*, 36 T.C.M. 719 (1977).[16]

The Tax Court here also places much emphasis on the absence of a written employment contract and/or a covenant not to compete between taxpayer and the Corporation. The elevation of form over substance in this analysis is manifest. If there were an employment contract and/or a covenant not to compete (in a single employee situation) and the employee-shareholder wished to withdraw his services from the corporate engagement, he could simply (as corporate officer) rescind the contract or covenant or decline to enforce it. There is no way of establishing an enforceable legal obligation which would require the sole shareholder-employee in a personal service corporation to work exclusively for the corporation. In the instant case, the employee-shareholder has in fact so worked exclusively. This fact is more significant than any paper obligation which might have been created. We note also that in the essentially meaningless corporate arrangements of *Roubik*, there was a covenant not to compete, which apparently had no realistic impact. *Roubik, supra* at 370.

We believe that, where the issue is application of the assignment of income doctrine to effectively set aside the corporation, under the particular circumstances of this case (which we have carefully delineated), an attempt to strike a balance between tax avoidance motives and "legitimate" business purposes is an unproductive and inappropriate exercise. Such an approach places too low a value on the policy of the law to recognize corporations as economic actors except in exceptional circumstances. This is true whether the analysis used to dismantle the corporation pursues the rubric of assignment of income or substance over form. Here there are other more precise devices for coping with the unacceptable tax avoidance which is unquestionably present in this case. But there is no need to crack walnuts with a sledgehammer. *Cf. Rubin v. Commissioner*, 429 F.2d 650 (2d Cir. 1970).

In the instant case, Section 482 of the Internal Revenue Code appears available to allocate among controlled taxpayers "gross income, deductions, credits, or allowances" to prevent evasion of taxes or to clearly reflect the income of the controlled taxpayers.[17] Other statutory provisions and "common law" doctrines, structured for more limited application, may also be available to remedy potential tax abuse. Thus, the dividends paid to taxpayer's children, any undue accumulation of earnings by the Corporation, the assignment of commissions already earned before formation of the Corporation on September 1, 1966, and nonpayment of taxpayer's salary for the balance of 1966 after September 1 may each be subject to attack via one or a combination of the following routes: the assignment of income doctrine, the Code provisions governing the improper accumulation of surplus (I.R.C. §§ 531–537) and the doctrine of

---

16. Additional cases discussing the applicability of the assignment of income doctrine in situations similar to that of the instant case include *Estate of Nathaniel Cole v. Commissioner*, 32 T.C.M. 313 (1973), and *Gettler v. Commissioner*, 34 T.C.M. 442 (1975).

17. With respect to Section 482 on remand, assignment of income principles may presumably

be employed to the limited extent of supporting the existence of a trade or business on the part of a shareholder who purportedly acts as a corporate employee in conducting his business affairs. *Rubin v. Commissioner*, 56 T.C. 1155, 1162 (1971). *Cf. Borge v. Commissioner*, 405 F.2d 673 (2d Cir. 1968).

constructive receipt. We think that the very aggressive tax avoidance measures which taxpayer employed here are vulnerable, but we express no opinion as to what statutory provisions or "common law" principles may properly address them.

We believe that, where all of the criteria set forth here are met, it is inappropriate to weigh "legitimate" business purposes against tax avoidance motivations in determining the application of the *Lucas v. Earl* assignment of income doctrine essentially to set aside a corporation for tax purposes. In the instant case, the Tax Court did not find that the Corporation was organized as a pure tax avoidance vehicle. Nor has the Tax Court perceived any flouting of the corporate form in the way business has been conducted. Pittsburgh Tube and Plymouth Tube entered into contracts requiring the Corporation to provide them services, for which they paid the Corporation. Taxpayer then worked exclusively for the Corporation in enabling it to carry out its responsibilities as a sales representative. The corporate tree seems sturdy enough to become fruit-bearing, subject, of course, to whatever pruning (radical or otherwise) by the tax collector appears appropriate.

We think that our approach in this case of recognizing some vitality in personal service corporations accords with congressional intent. "A history of legislation targeted at personal service corporations, the absence of any special exclusion of such corporations from corporate taxation and the personal holding company tax provisions indicate that to some extent Congress has sanctioned the incorporation of service businesses for tax purposes." Battle, *supra* n.15 at 802.

We, therefore, remand to the Tax Court for consideration of the issues surrounding the Commissioner's claim under Section 482 and other claims if available. For those purposes we do not disagree with the Tax Court's basic findings of fact in this case. But we do not intimate any conclusive view on what specific results with respect to these claims should be.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

As both sides of the issue are fully and fairly set forth in the majority opinion, little need be added in registering my dissent. Although I view it as a close case, I prefer in general the view of the United States Tax Court.[1] In the alternative, I believe Section 482 of the Internal Revenue Code applies.

This corporation is nothing more than a few incorporating papers lying in a desk drawer of no significance except when a tax return is due. Mr. Foglesong continued to conduct his original one-man sales representative business as he always did, except he has become insulated by those incorporating papers from the taxes he should have been paying. For a subscription price of $400 for all the preferred stock, this "should-be" taxpayer accomplished, among other things, the diversion to his children of at least $8,000 of his own income for each of the four taxable years. His make-believe corporation is too transparent for me to accept for tax purposes under Section 61 of the Code. I respectfully dissent.