929 F.2d 1252
 67 A.F.T.R.2d 91-718, 59 USLW 2631, 91-1
USTC P 50,168,
13 Employee Benefits Ca 2058
 Gary A. SARGENT and Janice B. Sargent, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Steven M. CHRISTOFF and Tami Jo Christoff, Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
Steven M. CHRISTOFF, Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Appellee.
 No. 90-1782.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 13, 1990.
Decided April 2, 1991.
 
 1
 John W. Hughes, New York City, for appellants.
 
 
 2
 Bruce R. Ellisen, Washington, D.C., for appellee.
 
 
 3
 Before ARNOLD and BEAM, Circuit Judges, and BOGUE,* Senior District Judge.
 
 
 4
 BOGUE, Senior District Judge.
 
 
 5
 This case, on appeal from the United States Tax Court, is one of first impression for this Court. Initially, the Commissioner of Internal Revenue issued Notices of Deficiency with respect to the federal income taxes of Gary A. Sargent[1] for the years 1978 through 1981; and for Steven M. Christoff[2] for the years 1980 through 1982.
 
 
 6
 Sargent and Christoff (hereinafter "Appellants") were hockey players with the Minnesota North Stars Hockey Club (hereinafter the "Club"). Appellants' personal service corporations (PSC), created to represent the business associations of each Appellant, contracted with the Club to provide each Appellant's services to the Club as a hockey player and, in the case of Sargent, also as a consultant. The North Stars paid each PSC for the use of each Appellant's services; each PSC, in turn, paid each Appellant a salary and contributed the remainder to each PSC's qualified pension plan. The Commissioner proposed to disallow these pension deductions and elected to tax Appellants on the entire amount paid by the Club to the PSC.
 
 
 7
 Appellant Sargent filed a Petition with the Tax Court on March 11, 1986, contesting the deficiencies. Appellant Christoff did likewise on May 17, 1988, and May 18, 1988.[3] The case was tried in the United States Tax Court, New York, New York, on November 16, 1988; and on November 13, 1988, Judge Tannenwald, Jr., writing for the majority,[4] issued an opinion upholding the deficiencies proposed by the Commissioner. We reverse the decision of the Tax Court and hold that Appellants were employees of their respective personal service corporations; and, therefore, Appellants should not be taxed on the pension deductions of their PSCs.
 
 STANDARD OF REVIEW
 
 8
 We review decisions of the United States Tax Court on the same basis as decisions in civil bench trials in United States District Courts. Commissioner v. Duberstein, 363 U.S. 278, 290-91, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960). The trial judge's findings of fact will not be set aside unless clearly erroneous. Id.; Fed.R.Civ.P. 52(a). Mixed questions of law and fact that require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewable de novo. United States v. McConney, 728 F.2d 1195, 1199-1204 (9th Cir.1984) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 9
 The determination of an employer-employee relationship involves a mixed question of law and fact. Because, however, the decision is predominantly one of determining whether the established facts[5] fall within the relevant legal definition, and does not involve constitutional issues, we apply a clearly erroneous standard of review. Id. at 1202-03. The Tenth Circuit has similarly concluded that the determination of an employer-employee relationship is a question of fact. Marvel v. United States, 719 F.2d 1507, 1515 (10th Cir.1983).
 
 BACKGROUND
 
 10
 The facts are set forth in detail in the Tax Court's opinion, and we shall state only the essentials: Appellants were both professional hockey players with the Minnesota North Stars Hockey Club. Prior to signing with the North Stars, Appellant Sargent sought out the assistance of Attorney Arthur Kaminsky concerning the benefits of incorporation. Kaminsky advised Sargent that incorporation provided two primary benefits: increased bargaining power and the possibility of placing money into a pension plan.
 
 
 11
 Based upon his consultations with Kaminsky, Sargent incorporated Chiefy-Cat, Inc. (Chiefy-Cat) on July 20, 1978. Sargent was the sole shareholder, president, and sole director of this personal service corporation. On July 20, 1978, Sargent entered into an Employment Contract with Chiefy-Cat wherein he agreed to provide his services as a professional hockey player and consultant exclusively for Chiefy-Cat for the period July 1, 1978, to June 30, 1984. At the same time, Chiefy-Cat agreed to furnish the services of Sargent as both a hockey player and consultant to the Club. In exchange, the Club agreed to pay Chiefy-Cat a set salary during each respective playing season.[6] Further, Sargent's employment agreement with Chiefy-Cat provided that Chiefy-Cat agreed to pay Sargent a set salary during each respective season.[7]
 
 
 12
 Chiefy-Cat withheld and paid the applicable federal and state income taxes and timely filed Employers Quarterly Federal Tax Returns and Forms W-2 and W-3. On March 5, 1980, the Commissioner of the Internal Revenue Service issued a letter whereby the pension plan established by Chiefy-Cat and covering Sargent was determined to be a qualified pension plan.[8] That favorable determination is still in effect and is not an issue before this Court.
 
 
 13
 Christoff followed substantially the same route toward incorporation. He employed the services of Attorney Kaminsky, and sought the same benefits as those sought by Sargent. Thus, on August 11, 1980, Christoff incorporated RIF Enterprises, Inc. (RIF), and entered into an employment agreement with RIF identical--for the most part--to that between Sargent and Chiefy-Cat. Likewise, RIF contracted with the North Stars and agreed to provide Christoff's services as a hockey player to the Club. In exchange, the Club agreed to pay RIF a salary during each respective hockey season.[9] From this salary, RIF directed contributions to the PSC's qualified pension plan.[10]
 
 
 14
 During the years at issue, neither Sargent nor Christoff were considered employees of the Club for purposes of the National Hockey League Players' Pension Plan. In each case, the Club paid Chiefy-Cat and RIF, respectively, the amounts that it would otherwise have contributed to the Players' Pension Plan on their behalf. The sole issue before this Court is whether Sargent and Christoff should be taxed now on those amounts contributed by their respective PSC's to each PSC's qualified pension plan.[11]I.
 
 
 15
 The Tax Court takes the position that because Sargent and Christoff were members of a hockey "team," the requisite control over them--for purposes of taxation--was lodged in the hockey Club, and not in their respective PSCs, with which they had a contractual employment relationship. We reject this contention.
 
 
 16
 With respect to the "control" factor, which is heavily relied upon by the Tax Court, the Regulations state:
 
 
 17
 In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so.
 
 
 18
 Treasury Regulation Sec. 31.3121(d)-1(c)(2) (1980).
 
 
 19
 It seems to this Court that legal analysis is forgotten if we simply measure the control element of an employment relationship by whether the employee is or is not a member of a superficially defined "team." Eventually, the issue becomes mired in a game of definitions: If the organizational structure is itself mislabeled a "team," a personal service corporation, as a matter of law, is a forbidden tax deferment tool for each and every person providing his or her services to that organization. On the other hand, if the organization to which the services are provided is not defined as a "team," then those same service-providers are free to create a PSC and subject that PSC's legitimacy to traditional common law and tax code analysis, regardless of the level of control exerted over those persons by the organization. Such an arbitrary approach is specious at best.
 
 
 20
 Accordingly, within Regulation Sec. 31.3121(d)-(1)(c)(2), two necessary elements must be met before the corporation, rather than the service-recipient, in this case the North Stars Hockey Club, may be considered the true controller of the service-provider. First, the service-provider must be just that--an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense. See Vnuk v. Commissioner, 621 F.2d 1318, 1320-21 (8th Cir.1980); Johnson v. Commissioner, 78 T.C. 882 (1982). Second, there must exist between the corporation and the person or entity (Club) using the services a contract or similar indicium recognizing the corporation's controlling position. See Pacella v. Commissioner, 78 T.C. 604 (1982); Keller v. Commissioner, 77 T.C. 1014 (1981), aff'd 723 F.2d 58 (10th Cir.1983); Johnson, supra.
 
 
 21
 These two elements were applied in a case strikingly similar to the one before us. In Johnson, supra, Charles Johnson, a professional basketball player with the San Francisco Warriors, created a PSC and the IRS sought to tax Johnson for the entire amount paid to his PSC by the Warriors. Without ever addressing whether Johnson was or was not a member of a "team," the Tax Court ultimately held the contracts to be dispositive of the issue of control:
 
 
 22
 In the case before us, we accept arguendo that the [PSC-Johnson] agreement was a valid contract which required the payments with respect to [Johnson's] performance as a basketball player ultimately to be made to the [PSC]. We also accept arguendo that the [PSC-Johnson] agreement gave [the PSC] a right of control over [Johnson's] services, ... Thus, the first element [of control] is satisfied. [emphasis added]
 
 
 23
 Johnson, 78 T.C. at 883.
 
 
 24
 Ultimately, Johnson was required to pay individual income tax on the entire amount paid to his PSC, but only because his PSC had no contractual arrangement with the Warriors basketball team. Said the Tax Court regarding the second prong of the "control" test: "[c]rucial is the fact that there was no contract or agreement between the Warriors and [the PSC]." Id. at 884. We are not faced with such a dilemma in this case. Not only did Appellants have a contractual arrangement with their respective PSCs, thereby passing the first prong of the analysis, each PSC also had a contractual relationship with the North Stars Hockey Club. Consistent with its analysis in the past, the Tax Court in Johnson concluded that the existence of bona fide contracts between the parties satisfied the requisite elements of control. Indeed, the Tax Court at no time concerned itself with whether Johnson was or was not a member of a "team."
 
 
 25
 The Tax Court's "team" analysis further breaks down when one looks at a decision handed down by the Tax Court just one day after the case before us. In Pflug v. Commissioner, 58 T.C.M. 685 (1989), an actress entered into an exclusive employment contract with her husband's corporation, Charwool Production, Inc. ("Charwool"), of which she was an officer. Subsequently, Charwool entered into a contract with 20th Century Fox Studios, agreeing to provide the services of Ms. Pflug for a new TV series. Although the ultimate issue was whether Ms. Pflug was subject to self-employment taxes on income received from Charwool, the Court was first required to decide whether Ms. Pflug was an employee of Charwool. In holding that Ms. Pflug was an employee of Charwool, and not an employee of 20th Century Fox Studios, the Tax Court held the contracts between the respective parties to be dispositive and stated:
 
 
 26
 The fundamental question is whether Charwool had the right to exercise dominion and control over the activities of [Pflug], not only as to results but also as to the means and methods used to accomplish the result. We find, by virtue of the contract [Pflug] entered with Charwool, Charwool had the requisite right to control [Pflug].
 
 
 27
 Id. at 688.
 
 
 28
 This Court is perplexed to find that those same contractual arrangements which were dispositive of the issue of "control" in Pflug were summarily discarded in the case before us. By the same token, those same "team" factors which were dispositive of the issue of control in the case before us were not even discussed in Pflug.
 
 
 29
 Was not Joanne Pflug a part of a team every bit as "controlled" as Sargent and Christoff? Like a hockey team in which different players assume different roles to insure success, the members of Pflug's team included the cast, writers, directors, and producers all working toward the common goal of producing a successful TV series. More importantly, just as a hockey player has a generalized set of plays tailored to fit his talents and the talents of his teammates, so, too, Ms. Pflug's "plays" included movements carefully choreographed to mesh with other cast members, a script prepared for her to follow, cue cards to insure that little or no deviation from the designed "play" occurred, and numerous retakes to guarantee that ultimate control vested in the hands of the studio, not Ms. Pflug's PSC. Nevertheless, the Tax Court concluded that Ms. Pflug was an employee of her PSC.
 
 
 30
 There can be little question that Ms. Pflug was part of a team under more stringent production controls than those placed on either Sargent or Christoff by the Club. But, as the Tax Court concluded, "... by virtue of the contract [Pflug] entered with Charwool, Charwool had the requisite right to control [Pflug]." Id. Appellants' contractual arrangements, which were every bit as bona fide as those entered into by Ms. Pflug,[12] should and do provide the requisite control for Appellants to be considered employees of their respective PSCs.
 
 
 31
 Once the "team" analysis of control is disregarded, this Court is able to fall back on ample Tax Court precedent which upholds the sanctity of contractual relations between taxpayers and their respective personal service corporations. In Haag v. Commissioner, 88 T.C. 604 (1987), the contractual arrangements between a doctor and his PSC again dictated the Courts' disposition of the case. The Tax Court stated:
 
 
 32
 We find that the employment agreement effectively gave the [PSC] the right to control petitioner's medical practice. Id. at 612.
 
 
 33
 Although the Commissioner argues that in each of these cases the employer-employee relationship was never addressed, this Court thinks otherwise. Each time the legitimacy of the employee's relationship with the corporation was raised, the Tax Court pointed to the existence of a contractual relationship between the corporation and the employee/service-provider as the rationale for upholding the legal significance of the PSC. In Keller, supra, for example, the Tax Court respected the contractual arrangements entered into by the taxpayer and the PSC, and held them out as the basis for distinguishing its decision in Roubik v. Commissioner, 53 T.C. 365 (1969), stating:
 
 
 34
 The corporation (in Roubik) did not enter into any arrangements to provide the services of its purported employees; personal contractual obligations between the taxpayers and the parties for whom they provided services persisted.
 
 
 35
 77 T.C. at 1032.
 
 
 36
 The Commissioner's position (in Keller )--that the existence of the employer/employee relationship was never addressed--is further eroded when one realizes that Dr. Keller was required to pay individual income taxes for the single year in which he had no contractual relationship with the PSC. One year later, when contractual arrangements were entered into between Keller, Inc. and MAL, Inc., the payments from MAL to Keller were not taxed to Dr. Keller individually, but instead were taxed to his PSC.
 
 
 37
 Quite simply, we agree with the position taken by the Tax Court in Keller, supra, when it stated: "[w]e find that an employment relationship was created in this case by the employment agreement and that it was maintained by the parties to the agreement after execution." 77 T.C. at 1032. Appellants in this case entered into bona fide arms lengths agreements with their respective PSCs. For this reason, each is considered to be an employee of that PSC, and not an employee of the North Stars Hockey Club.
 
 II.
 
 38
 By rejecting the Tax Court's "team" test, and embracing the viability of the contractual relations between Appellants and their personal service corporations, we have effectively decided the only issue presented for our deliberation: By whom were Appellants employed? Thus, because Appellants were employees of their respective PSCs, they were improperly taxed on the entire amount paid by the North Stars Hockey Club to the PSCs.
 
 
 39
 Furthermore, by embracing the "contract" theory of this case, we are at the same time discarding the Tax Court's conclusion that this case involves the "assignment of income" doctrine, as articulated in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930),[13] and its progeny, and Section 61 of the Tax Code. The Tax Court's contention that Appellants were attempting to employ a corporate "assignment of income" scheme to evade their income tax responsibility is without merit.
 
 
 40
 We do not doubt that the "assignment of income" doctrine serves a useful tax purpose. For example, as the Tax Court observed in Keller: "The assignment of income doctrine * * * constitutes an essential tool * * * where the corporation is not respected by the taxpayer/shareholder as a separate entity which carries on business activities." 77 T.C. at 1033. Overuse of the assignment of income doctrine, however, has met with stiff resistance.
 
 
 41
 In Foglesong v. Commissioner, 35 T.C.M. 1309 (1976), rev'd and remanded at 621 F.2d 865 (7th Cir.1980), the IRS attempted to set aside the transactions entered into by a corporation without ever looking at the validity of the corporation itself. Said the Seventh Circuit:
 
 
 42
 We believe that, where the issue is application of the assignment of income doctrine to effectively set aside the corporation, under the particular circumstances of this case * * *, an attempt to strike a balance between tax avoidance motives and "legitimate" business purposes is an unproductive and inappropriate exercise. Such an approach places too low a value on the policy of the law to recognize corporations as economic actors except in exceptional circumstances.
 
 
 43
 Id. at 872.
 
 
 44
 In Johnson, supra, a case whose facts run parallel to the facts of this case, the Tax Court also observed, regarding the blind application of Lucas v. Earl:
 
 
 45
 However, the realities of the business world present an overly simplistic application of the Lucas v. Earl rule whereby the true earner may be identified by pointing to the one actually turning the spade or dribbling the ball. Recognition must be given to corporations as taxable entities which, to a great extent, rely upon the personal services of their employees to produce corporate income. Where a corporate employee performs labors which give rise to income, it solves little merely to identify the actual laborer. Thus, a tension has evolved between the basic tenets of Lucas v. Earl and recognition of the nature of the corporation business form.
 
 
 46
 Id. at 890.
 
 
 47
 As long as a corporation carries on some form of business, the Supreme Court has concluded that the tax advantages which properly flow from incorporation should not be questioned. The Supreme Court reasoned:
 
 
 48
 The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.
 
 
 49
 Moline Prop. Inc. v. Commissioner, 319 U.S. 436, 438-39, 63 S.Ct. 1132, 1133-34, 87 L.Ed. 1499 (1943).
 
 
 50
 The Tax Court voiced this same conclusion almost forty years later, when it stated that "[t]he policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business." Keller, 77 T.C. at 1031. Indeed, at no time has the Commissioner questioned the legitimacy of Appellants' corporate business activities. According to the record, both RIF and Chiefy-Cat withheld income and employment taxes from the salary payments to Appellants; paid contributions to the Chiefy-Cat Pension Plan and the RIF Pension Plan on account of their employment of Sargent and Christoff[14], respectively; filed forms 940 and 941 with respect to the withholding taxes; and filed corporate tax returns and paid corporate income taxes. Such obvious business activity by Appellants' PSCs is far removed from that conduct which is forbidden under the "assignment of income" doctrine.
 
 
 51
 Neither will this Court question the motivation behind Appellants' desire to incorporate. That each Appellant has taken steps to enhance his retirement through a richer corporate sponsored pension plan is of no consequence to this court. The Code provisions relating to qualified retirement plans are a deliberate congressional bestowal of benefits upon employers and employees; efforts to obtain the advantages of these benefits, by way of conducting business in the corporate form, are not to be deemed to render the taxpayer culpable of illegal tax avoidance or evasion. See Keller, 77 T.C. at 1030. Thus, "[o]nce a corporation is formed and all organizational and operational requirements are met, it should be recognized for tax purposes regardless of the fact that it was formed to take advantage of richer corporate retirement plans." Achiro v. Commissioner of Internal Revenue, 77 T.C. 881, 895-96 (1981).
 
 
 52
 Unfortunately, taxpayers will often go to great lengths to evade unlawfully the payment of income taxes. Whether it simply be lying on their tax forms, assigning income to those who have not earned it, or sheltering income in non-existent or improper tax-avoidance investments, each is destructive to the often painful revenue-production responsibility of the IRS. In this case, however, we are presented with taxpayers who have fulfilled each and every task required of them in order to become properly incorporated. More importantly, for purposes of this case, Appellants took steps to insure that each was a contractually-bound employee of his respective PSC. That these contracts of employment were recognized and respected by the North Stars Hockey Club, the National Hockey League and the Minnesota Office of Administrative Hearings[15] lends substantial credibility to the fact that Appellants were employees of their respective PSCs--and not the North Stars Hockey Club.
 
 III.
 
 53
 This Court agrees with the Tax Court that our result is unaffected by application of Section 482 of the Code.[16] Section 482 allows the Commissioner to "distribute, apportion or allocate gross income, deductions, credits or allowances" between or among "two or more organizations, trades or businesses * * * owned or controlled directly or indirectly by the same interests" if he determines that such action is "necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or businesses."[17]
 
 
 54
 Our result is unchanged because, as we stated earlier, Appellants created their respective PSCs for a legitimate business purpose. An apportionment by the Commission would result in Appellants being taxed only on those amounts paid to them by their respective PSCs. Accordingly, those amounts transferred into corporate pension funds are the legitimate by-product of each PSC's corporate existence.
 
 IV.
 
 55
 In conclusion, this Court finds that Appellants were, at all times relevant to this case, employees of their respective personal service corporations. Furthermore, the PSCs established by Appellants are legitimate corporate entities, created to conduct Appellants' business. Appellants, therefore, are obligated to pay income tax only on those amounts paid to them as salary by their respective PSC. For all of the reasons articulated above, the decision of the United States Tax Court is
 
 
 56
 Reversed.
 
 
 57
 ARNOLD, Circuit Judge, dissenting.
 
 
 58
 I would affirm, essentially for the reasons given in Judge Tannenwald's thorough opinion for the Tax Court, 93 T.C. 572 (1989). In my view, the finding that the taxpayers were employed by the Minnesota North Stars Hockey Club, rather than by their respective personal-service corporations, is not clearly erroneous. The coach of the North Stars had the right to control, and actually did control, the conduct of Sargent and Christoff on the ice. The idea that the coach issued orders to Sargent and Christoff in their capacity as corporate officers, which orders they then relayed to themselves as corporate employees, is fanciful.
 
 
 
 *
 The Hon. Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation
 
 
 [1]
 The Commissioner determined the following deficiencies in Gary A. Sargent's Federal Income taxes: 1978--$14,577.74; 1979--$18,041.24; 1980--$18,852.04; 1981--$27,882.96. In each year, Sargent's Federal Income taxes were paid jointly with his wife, Janice B. Sargent
 
 
 [2]
 The Commissioner determined the following deficiencies in Steven M. Christoff's Federal Income taxes: 1980--$21,798; 1981--$23,118.35; 1982--$519. In 1981 and 1982, Christoff paid his taxes jointly with his wife, Tami Jo Christoff
 
 
 [3]
 These cases were consolidated for trial and five other taxpayers who received similar Notices of Deficiency have agreed to be bound by the outcome of this case. See Petitioners docket numbers 8821-87, 10976-87, 7131-88, 8490-88, and 17373-88
 
 
 [4]
 Twelve judges concurred in Judge Tannenwald's opinion, while six judges dissented, with Judge Wells writing for the dissenters
 
 
 [5]
 Prior to trial, the parties entered into a Stipulation of Facts, a Second Stipulation of Facts, a Third Stipulation of Facts, and a Supplemental Stipulation of Facts. Typically, "[w]e review de novo the applicability of tax benefit principles to the stipulated facts." Schwartz Rojas v. Commissioner, 901 F.2d 810, 812 (9th Cir.1984). In this case, however, we are doing more than simply applying tax benefit principles to the stipulated facts; we are also defining the nature of the employer-employee relationship within the rubric of personal service corporations
 
 
 [6]
 In exchange for Sargent's services as both hockey player and consultant, the Club paid to Chiefy-Cat the following: 1978--$85,000; 1979--$115,000; 1980--$120,000; 1981--$130,000
 
 
 [7]
 The employment contract between Chiefy-Cat and Sargent provided that Chiefy-Cat agreed to pay Sargent $60,000 during the first year and $95,000 for each succeeding year
 
 
 [8]
 Apparently, not only has the IRS recognized the viability of each PSC's pension plan, in two separate Stipulations of Settled Issues (November 23, 1988 and February 2, 1989), the Commissioner agreed that interest and dividends earned on the amounts contributed to each PSC's qualified pension plan (both Chiefy-Cat and RIF), are not taxable to Sargent and Christoff individually. Chiefy-Cat made the following contributions to the plan: 1978-79--$20,893; 1979-80--$24,675; 1980-81--$27,099; 1981-82--$27,749
 
 
 [9]
 The Club paid RIF the following during each respective season: 1980--$63,500; 1981--$71,500. In turn, RIF paid Christoff $45,000 during 1980, and $50,000 during 1981
 
 
 [10]
 On September 1, 1981, the Commissioner issued a letter whereby RIF's pension plan covering Christoff was determined to be a qualified pension plan. RIF made the following contributions to the plan: 1980-81--$7,200; 1981-82--$17,750; 1982-83--$1,625
 
 
 [11]
 It is interesting to note that Robert Smith and Michael Fidler, also hockey players with the Minnesota North Stars, established similar personal service corporations at the same time as Appellants--and with the same attorney. Following an audit, the Commissioner determined that the income paid by the North Stars to Smith's and Fidler's PSCs was taxable directly to Smith and Fidler, respectively, and issued Notices of Deficiency to each. After the cases were docketed, the Commissioner conceded that the amounts paid by the Club to the PSCs was taxable to the PSCs, and not to Smith and Fidler individually. The Stipulation of Settlement in the Smith case stated: "The Petitioner does not have additional wages of $26,050, $41,186, or $50,098 for the years 1978, 1979, and 1980, respectively; this income was properly reported as the income of Denlate Ice, Inc."
 
 
 [12]
 Actually, the contracts in this case were of a more bona fide nature because they were in writing. A written contract between Ms. Pflug and Charwool was never produced, and the only evidence of the existence of a contract was Ms. Pflug's oral testimony. Pflug v. Commissioner, 58 T.C.M. at 688
 
 
 [13]
 Lucas v. Earl involved a contract between husband and wife which declared all property which they were to receive to be taken by them as joint tenants. The husband received salary and attorneys' fees and was the only party to the contracts by which the salary and fees were earned. The Supreme Court held that half the husband's personal service income could not by the contract be assigned to the wife for tax purposes. Mr. Justice Holmes noted that the arrangement was one by which "the fruits are attributed to a different tree from that on which they grew." 281 U.S. 111, 115, 50 S.Ct. 241, 241, 74 L.Ed. 731. In the case before us, Appellants' PSCs have a contract with an unrelated third party [the Club] which requires payments directly to the PSC. The situation in Lucas v. Earl is clearly inapposite
 
 
 [14]
 Chiefy-Cat adopted the Chiefy-Cat, Inc. Money Purchase Pension Plan, effective July 1, 1978; and, on March 5, 1980, the Commissioner issued a favorable determination letter to Chiefy-Cat, confirming the Plan to be qualified under Section 401 of the Code. Accordingly, RIF adopted the RIF Enterprises, Inc. Money Purchase Pension Plan and received a similar favorable determination letter on September 1, 1981, confirming the Plan's Section 401 qualification
 
 
 [15]
 As the employer of Christoff, RIF was required under Minnesota law to obtain worker's compensation insurance for Christoff. When Employer's Insurance of Wausau, RIF's worker's compensation insurer, was required to pay claims on behalf of Christoff, it refused, arguing that it was not responsible for these claims because Christoff was an employee of the Club and not RIF. Thus, Employer's Insurance of Wausau claimed that the Club's insurer, Great American Insurance Company, was required to pay Christoff's claim. After a hearing and testimony, Judge Otto of the State of Minnesota Office of Administrative Hearings determined that "Mr. Steven Christoff was an employee of RIF Enterprises, Inc., at all times material to this proceeding for injuries sustained by him while playing hockey for the North Stars Hockey Partnership subsequent to August 11, 1980."
 
 
 [16]
 Section 482 of the Tax Code provides: In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible
 (Aug. 16, 1954, c. 736, 68A Stat. 162; Oct. 4, 1976, Pub.L. 94-455, Title XIX, Sec. 1906(b)(13)(A), 90 Stat. 1834; Oct. 22, 1986, Pub.L. 99-514, Title XII, Sec. 1231(e)(1), 100 Stat. 2562.)
 
 
 [17]
 Congress enacted Section 269A of the Code in 1982 to specifically address personal service corporations. Generally, section 269A provides that the commissioner may apportion a PSCs income taxes if it appears that the PSC was formed: (1) to provide its services to one other corporation, partnership, or entity; and (2) the principal purpose behind formation was the avoidance or evasion of income taxes by reducing the income for any employee-owner which would not otherwise be available. We have already concluded, however, that Appellants' PSCs were established for a legitimate purpose, and Appellants had bona fide employment contracts with their respective PSCs